Ronnie LEGETTE, Appellant,

v.

UNITED STATES, Appellee.

No. 10–CF–1397.

District of Columbia Court of Appeals.

Argued Dec. 11, 2012.
Decided June 20, 2013.

Christine A. Monta, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Chrisellen R. Kolb, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Peter V. Taylor and David A. Last, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and THOMPSON, Associate Judges, and KING, Senior Judge.

THOMPSON, Associate Judge:

In this case, we are confronted once again with the "perplexing" question of "when evidence of a particular criminal act [i.e., so-called "other crimes evidence"] may be admitted." *Thompson v. United States*, 546 A.2d 414, 415 (D.C.1988). The question arises in this case because, in a trial in which appellant Ronnie Legette was charged with three counts of first-degree sexual abuse while armed (with a gun), kidnapping while armed, five counts of possession of a firearm during a crime of violence, armed robbery, felony threats, and possession of a firearm by a convicted felon, the trial court permitted the government to present testimony by a complainant who described how appellant, armed with a gun, had sexually assaulted her six years earlier under circumstances similar to those alleged in this case. The jury convicted appellant on all charges. Appellant assigns as error the trial court's ruling that allowed the government to present the prior-sexual-assault testimony. He argues that the testimony was not probative as to any "genuinely controverted" issue in the case except insofar as it supported "an impermissible propensity inference," i.e., an inference that appellant "had a general predilection to rape people he encountered on the street."[1]

We think the question whether the trial court erred in admitting the testimony requires a more nuanced answer. In light of appellant's consent defense, which his trial counsel asserted in her opening statement and thereafter pursued through his examination of witnesses, we conclude that the prior-sexual-assault testimony was admissible as "intent" evidence—specifically, as evidence tending to prove that appellant had the intent to engage in the charged sexual acts by force. At the same time, we conclude that the court's instructions to the jury erroneously permitted jurors to consider the prior-sexual-assault evidence as "motive" evidence. We conclude ultimately that the error was harmless because the testimony was legitimately probative of intent, the prejudicial effect of the testimony did not substantially out-

---

1. Our case law has used the terms "first-degree sexual abuse" and "rape" interchangeably. *See Bryant v. United States*, 859 A.2d 1093, 1097 (D.C.2004); *Russell v. United States*, 698 A.2d 1007, 1008 (D.C.1997).

weigh that probative value, and admission of the testimony for an improper purpose added only marginally (if at all) to its prejudicial effect and does not alter the result of the balancing of probity against prejudice. Accordingly, we affirm the judgment of conviction.

## I. Background

J.S.,[2] the government's chief witness, testified that on May 14, 2006, shortly after 6:30 a.m., she was running late on her way to work and was waiting alone at a bus stop on Benning Road when a man, whom J.S. identified at trial as appellant, approached her, asked her whether she had been waiting long, and then told her that she was "very pretty."[3] J.S. testified that she informed appellant that she is a man, and that "what happened next" was that appellant asked J.S. whether she wanted to "go somewhere" (a question she understood to mean, "Do you want to go somewhere and have sex with me right now?"). J.S. said that she had to go to work but would be free in the evening. Appellant "reacted angrily." Appellant then asked, "If I had a gun would you go?" At that point, appellant pulled out a gun, pointed it at J.S., and told her that if she ran, he would "blow [her] brains out."[4] Appellant told J.S. to walk across the street, and he walked just behind her, until they turned into an alley and arrived at an abandoned house a block or so away. Appellant opened the door to the house by "unravel[ing]" a wire coat hanger that had been wrapped around the doorknob to keep it closed. Once inside the dark house, appellant asked J.S. what she was "willing to do for [her] life." Appellant then motioned or "point[ed] to his private area" and pulled down his pants, exposing his penis. Appellant placed his gun behind him on a nearby ledge, and J.S., fearing for her life, "performed oral sex on him." Afterwards, appellant "turn[ed J.S.] around," pulled her pants and underwear down, and forced his penis inside her rectum. When that encounter ended, appellant grabbed the back of J.S.'s head, pulled it towards him, and made J.S. "suck the blood and feces off of his penis." Appellant then pulled his pants back up and "turned back pleasant" again, hugging J.S., kissing her on the forehead, and telling her that she did not have to be afraid of him. He also mentioned "not calling the police" and told J.S. that if she called the police, "nobody's going to believe a faggi anyway."[5] Appellant took J.S.'s sunglasses, cell phone, and money, but gave her back a dollar to use as bus fare to get to work and told her to call her cell phone when she got off work and he would meet her at the bus stop and return it to her. Appellant and J.S. then exited the house and walked in opposite directions. J.S. saw appellant holding the cell phone to his ear as he walked away. The parties stipulated that cell phone records showed calls later that day from J.S.'s cell phone to appellant's mother and friends.

2. J.S., who agreed that she is a "transgender," testified that she is "anatomically a male," but "psychologically" is a woman.

3. J.S. testified that no cars drove by and no other people were on the street.

4. During cross-examination, defense counsel highlighted that J.S. told police that the gun with which appellant threatened her was silver, while she told the grand jury that it was black.

5. During cross-examination, defense counsel elicited J.S.'s acknowledgment that she told the grand jury that she "gave [appellant] a hug" after the incident and "held him real tight" "just to calm him down," because he was "so scared" and "looked like he was worried that [she] would probably call the police...."

At the time of the incident, J.S. lived with her sister. The sister testified that at around 6:45 a.m., J.S. returned home and was banging on the door and screaming, and that when she opened the door, J.S. was crying and was "really, really upset." According to the sister, J.S. informed her that "a guy" had robbed her and forced her to have oral and anal sex. The sister stated that J.S. appeared to be in pain, explaining that J.S. sat on her side, as if it hurt to sit in a regular position. During the months after the incident, J.S., who had been an "outgoing person, a very funny person," "just wasn't h[er]self," but was "sad and depressed."[6] The Metropolitan Police Department officer who responded to the sister's call described J.S. as "very distraught" and "shaking" as she described the incident.

Nichie Douglas, a sexual assault nurse examiner ("SANE nurse"), examined J.S., who informed Douglas that she had been sexually assaulted. Douglas collected oral, anal, and anorectal swabs. Douglas did not detect any injuries or any "obvious cuts or tears" on J.S.'s body, but testified that J.S. complained of pain in her rectal/anus area.[7] Douglas testified that J.S. appeared "sad and upset" and told Douglas that she "felt dirty."

The jury was read a stipulation that appellant became a suspect after a search of the FBI's DNA database revealed that the DNA profile from biological material obtained from J.S.'s rectal swabs matched the DNA profile of appellant. The jury was not allowed to learn that appellant's DNA profile was obtained in connection with an earlier sexual assault in 2000, or that, after a criminal proceeding in the Superior Court Juvenile Division, appellant (who was 17 years old at the time) had been found responsible as a juvenile for that sexual assault. However, the complainant in the 2000 sexual assault, J.W., testified as a government witness in the instant matter.

J.W. told the jury that on the evening of March 3, 2000, she was standing alone on Georgia Avenue, trying to hail a taxicab, when appellant (whom she recognized as a fellow student at Roosevelt High School) came across the street to where she was standing and began talking to her. Appellant had been standing with "a bunch of guys" across the street, but otherwise "there really wasn't anyone else outside that night," only a few cars drove by, and the street was quiet. Appellant told J.W. that he had "always liked" her, and he offered to walk her home. When J.W. declined the offer, appellant walked further up Georgia Avenue towards an area of abandoned buildings. Very shortly thereafter, appellant returned to where J.W. was standing and told her that he had a gun and would shoot her if she screamed. J.W. saw the handle of a gun in appellant's coat pocket. Appellant told her to come with him and walked her to a

---

6. Antonyo Hailstock, J.S.'s "godfather," similarly described changes in J.S.'s demeanor after the incident, testifying that J.S. (who moved into Hailstock's house after she was released from the hospital) would wake up in the middle of the night screaming or crying, initially would not go outside, and, when she did return to work, was "really nervous" about walking alone to or from the bus stop. Hailstock would have to meet J.S. at the bus stop when she was on her way home or talk to her on her cell phone while she was walking from the bus stop to the house. J.S. also cut her hair, began wearing baggy clothing, and no longer dressed as a female.

7. Suzanne Rotolo, a SANE nurse for 34 years (who did not examine J.S. but testified as an expert) told the jury that in her experience, patients complain of pain during the sexual-assault-examination procedure "only if there has been an injury." Rotolo also testified that the majority of patients who report anal rape "have no injuries whatsoever."

back alley behind Georgia Avenue where there were two abandoned garages. There, appellant told J.W. to pull her pants down, stood behind her as she leaned on a wall, and penetrated her vagina with his penis. After that, J.W. testified, appellant made her get into an abandoned truck that was in the garage and made her perform oral sex on him. Appellant then directed J.W. to get on top of him in the truck, and he again penetrated her vagina with his penis. Afterwards, appellant "started talking to" J.W., saying that he "shouldn't have done this" and expressing concern that J.W. was "going to call the police and ... going to tell everybody." Appellant got dressed and allowed J.W. to dress and to walk out of the alley, warning her not to scream or yell. J.W. went to the home of her boyfriend, where the boyfriend's mother called the police. The police took J.W. to a hospital, where she underwent a sexual assault exam (the collection vehicle for the DNA that produced the cold-hit match to DNA collected during J.S.'s sexual-assault examination). After the incident, J.W. felt "kind of paranoid," "didn't want to be around people," and broke up with her boyfriend.[8]

Appellant did not testify, but defense counsel asserted in her opening statement that appellant had consensual, anal sex with J.S. on May 14 and took J.S.'s cell phone. Counsel told the jury that it was only after the anal-sex encounter that J.S.

revealed to appellant, for the first time, that she is a biological male.[9] Upon learning that fact, counsel asserted, appellant insulted and said hurtful things to J.S., and J.S. retaliated by falsely accusing him of rape. During the defense case, counsel called Joseph ("Demita") Armstrong, who described herself as transgendered and testified that she knew J.S. through "transgender outreach groups."[10] Armstrong testified that in 2009, she overheard a conversation during which J.S. stated that "a guy" had "worked her"—which Armstrong understood to mean that J.S. "performed the sexual or whatever things with him, and he didn't give her the money"—and had robbed her of money and her cell phone, and for that, J.S. "got him locked up."

Upon the jury's guilty verdicts, the trial court sentenced appellant to an aggregate term of 540 months' incarceration. On appeal, the sole issue appellant raises is his claim that the trial court abused its discretion in admitting J.W.'s testimony. He argues that her testimony about a prior sexual assault "served only the impermissible purpose of showing that the appellant had a propensity to commit sex crimes[,]" and that the evidence therefore was inadmissible under *Drew v. United States*, 331 F.2d 85 (D.C.Cir.1964).

## II. Applicable Law

"Although the fact that a person committed a crime on another occasion

---

**8.** During cross-examination, defense counsel posed questions suggesting that J.W. believed her boyfriend had "possibly cheat[ed] on her" and that she had had consensual sex with appellant, with whom the boyfriend did not get along, to get back at the boyfriend.

**9.** Defense counsel elicited from Douglas on cross-examination that she observed during the sexual-assault examination that J.S. had a "small scrotal sack" and that J.S. reported that she was taking hormones, testimony that

apparently was intended to explain why, according to the defense, appellant had not noticed J.S.'s male gender during the anal-sex encounter. As appellant puts it in his brief, defense counsel "conceded that [appellant] took [J.S.'s] cell phone 'out of spite' after she revealed to him that she was actually a man."

**10.** Armstrong also testified that she was "friends" with appellant, whom she knew because he had dated her sister.

logically tends to show a disposition to commit a similar crime today, and thus perhaps to make it more likely that he committed the offense for which he is on trial, evidence of past misconduct is nevertheless inadmissible to prove his disposition to commit the similar crime, for the tendency of such evidence to prejudice the jury is thought to outweigh its probative value." *Thompson*, 546 A.2d at 418. While the rule is hardly universal,[11] it is well established in our jurisdiction that in the case of sex crimes as well as other crimes, "evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew*, 331 F.2d at 89. "The propensity rule does not, of course, preclude the admission of evidence of other crimes when such evidence is relevant to issues other than the defendant's predisposition to commit the crime." *Thompson*, 546 A.2d at 418. "Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial." *Drew*, 331 F.2d at 90. These exceptions to the propensity rule "are not necessarily exhaustive." *Thompson*, 546 A.2d at 420 n. 9.

▮ Before a court may admit other-crimes evidence under one of the exceptions, the government must first establish (1) by "clear and convincing evidence that the defendant committed the other offense" (a burden that was met in this case since the Juvenile Court had found appellant responsible for the other crime[12]); (2) that the other crimes evidence is "directed toward a genuine, material and contested issue in the case"; and (3) that the evidence is "logically relevant to prove this issue for a reason other than its power to demonstrate criminal propensity"; and (4) "the evidence must be more probative than prejudicial." *Roper v. United States*, 564 A.2d 726, 731 (D.C.1989). "Regarding the last factor, the appropriate balancing test is whether the prejudicial impact of the evidence 'substantially' outweighs its probative value." *Bacchus v. United States*, 970 A.2d 269, 273 (D.C.2009). When the trial court has admitted other crimes evidence on the basis of the *Drew* "intent" exception, this court must consider:

(1) whether, and to what degree, intent as an issue can be distinguished from predisposition to commit the crime; (2) whether intent is a genuine, material and important issue, rather than merely a formal one; (3) whether the trial judge made [her] decision whether or not to admit the evidence at an appropriate time, when information as to all pertinent factors was available; and (4) whether the trial judge's instructions to the jury could and did resolve any issue of prejudice.

*Thompson*, 546 A.2d at 421; *see also id.* at 423, 423 n. 16 ("[T]he decision whether other crimes evidence is admissible under

---

11. *See, e.g.,* Fed.R.Evid. 413(a) (providing that "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. The evidence may be considered on any matter to which it is relevant."); *see also United States v. Horn*, 523 F.3d 882, 887 (8th Cir.2008) (explaining that while "[e]vidence of prior bad acts is generally not admissible to prove a defendant's character or propensity to commit crime," Congress "modified this rule in sex offense cases when it adopted Rule[ ] 413") (internal quotation marks omitted).

12. *See Thompson*, 546 A.2d at 421 n. 11.

the intent exception should ordinarily be deferred until the trial judge has sufficient knowledge of the government's need for the evidence [knowledge obtained, for example, through "a defense opening statement, or other comparable indication, that intent is a controverted issue"], and of the defendant's defense, to make an informed judgment.") In reviewing any limiting instruction given by the court, we consider whether the instruction "has been phrased in terms which a jury is likely to understand." *Id.* at 426. We review a trial court's decision to admit other-crimes evidence for abuse of discretion. *See Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010).

## III. The Trial Court's Ruling

In its pre-trial "Notice of Intent to Introduce Evidence of Defendant's Other Crimes and Prior Bad Acts," the government told the court that the proffered testimony about appellant's armed sexual assault on J.W. was "relevant to establish the defendant's identity as the perpetrator, as well as to prove his motive and intent in forcibly raping [J.S.], and in establishing that the sexual assault acts were non-consensual." The trial judge recognized that her ruling on the admissibility of the other crimes evidence depended in large part on what defense would be asserted. Before having heard a proffer about the defense theory of the case—but inviting defense counsel to make a proffer—the judge stat-

ed that she thought the evidence would be "quite relevant" "if the defendant were to testify or if there were any hint in opening, cross-examination, closing, or anywhere else in the trial that there was a consent defense here[.]" When defense counsel confirmed that he would "open on" consent (and that identity would not be an issue), the court ruled that the other crimes evidence would be admissible in the government's case-in-chief, explaining that "a consent defense ... goes directly both to the defendant's state of mind and to the victim's state of mind." Evidence of the previous sexual assault, the court said, would "not be admitted ... for the purpose of establishing propensity, but in fact to establish both an absence of consent and the defendant's motive [13] in approaching the victim and carrying out this actual assault." [14]

Several days later, before J.W. testified, the court sought confirmation from defense counsel that the defense was not "backing off of consent" as a defense. In an *ex parte* conference at the bench, defense counsel confirmed that he would be arguing consent and added that he also intended to call a witness (Armstrong) who would testify that she heard J.S. say that the encounter between J.S. and appellant was (as the court summarized the proffer) "some sort of sex in exchange for money thing and ... the money part went bad." Thereafter, the court said that it would maintain its ruling and clarified its rationale:

---

**13.** Here, the court appears to have used the term "motive" as synonymous with "intent" (although the court later observed that "motive is somewhat different" from "intent" and that "frankly, we could sit around all day long parsing the differences between the two").

**14.** Defense counsel protested that the government's argument was "essentially that because Mr. Legette did this in the past that it is more likely that he did this in the current charged case." Counsel argued that the evi-

dence would be propensity evidence because "[t]here's no other reason for it to come in." Disagreeing, the court responded:

> [I]t's the force and the absence of consent that is the relevant issue here, and ... the Government, I assume is going to be arguing that the prior event is probative of the defendant's state of mind, that is, his understanding and knowledge that there was no consent, and the victim's state of mind, in other words, that there was no consent.

I conclude, ... given the defense in this case, which will in some form or fashion be an argument to the jury that the complainant consented to the sex in this case, that the evidence ... that the defendant previously forced sex upon another human being in circumstances similar to this one is relevant and very probative with regard to the defendant's state of mind, in other words, his understanding that the sex in this case was not consented to, and the motive behind all of his actions in the case, in other words, that he had planned to and was carrying out a plan to force sex upon some individual, any individual, the one he chose after having formulated the plan, and that the prior crime is extremely probative of motive and intent. So I will admit it. I do find that the prejudicial effect does not substantially outweigh the probative value.[15]

Appellant now argues that the trial court abused its discretion in admitting the evidence under the "intent" and "motive" exceptions to *Drew*.

### IV. Analysis

*A. Whether J.W.'s testimony was admissible under the "intent" exception*

■ Appellant contends that because he acknowledged having engaged in sex with J.S., his own intent was not in dispute "in any meaningful sense."[16] The only genuine dispute at trial, he asserts, was "whether [J.S.] consented to sexual relations" with him, and evidence that he sexually assaulted an unrelated woman six years earlier "was irrelevant to the question whether [J.S.] consented[.]"

If the "intent" issue had been merely whether appellant acted toward J.S. with the intent to gratify his sexual desire, we would agree with appellant that his intent was not genuinely controverted, because he did not contest that he intended to and did engage in sexual acts with J.S.[17] Further, we agree with appellant that the sexual offense involved in this case, first-degree sexual abuse,[18] "requires no intent other than that indicated by the commission of the acts constituting the offense." *Kyle v. United States*, 759 A.2d 192, 199 (D.C.2000) (internal quotation marks omitted). We reject, however, appellant's argument that intent was not genuinely in issue in this case.

■ As appellant acknowledges, for a conviction of first-degree sexual abuse, the requisite intent is "the intent to (1) engage in a sexual act (2) by force." Appellant's Reply Brief at 4. Because appellant's de-

15. The court cited this court's opinions in *Crisafi v. United States*, 383 A.2d 1 (D.C. 1978), *Calaway v. United States*, 408 A.2d 1220 (D.C.1979), and *Dyson v. United States*, 848 A.2d 603 (D.C.2004), discussed *infra*.

16. *Cf. Thompson*, 546 A.2d at 422 ("Evidence of other misconduct is not admissible to prove intent unless intent is genuinely in issue[.]").

17. *Cf. Robles v. United States*, 50 A.3d 490, 493 (D.C.2012), as amended, ⸺ A.3d ⸺ (May 8, 2013) (explaining, in two-count misdemeanor sexual abuse case prosecuted under D.C.Code § 22–3006 (2001), that the *Drew* "intent" exception was not applicable because the intent required for conviction

"was only that [the defendant] had sexual contact with the complainants intending ... to gratify his sexual desire," an intent he "did not dispute") (internal quotation marks and alteration omitted).

18. *See* D.C.Code § 22–3002(a) (2001). In relevant part, § 22–3002(a) provides that a person commits first-degree sexual abuse if he "engages in or causes another person to engage in or submit to a sexual act in the following manner: (1)[b]y using force against that other person; [or] (2)[b]y threatening or placing that other person in reasonable fear that any person will be subjected to death, bodily injury, or kidnapping[.]"

fense was a denial of the use of force and an assertion that J.S. consented to the charged sexual acts, the government's burden was to prove J.S.'s lack of consent, "or, put another way, ... [to prove appellant's] intent to use force in [his] sexual encounter with her." [19] *Bolanos v. United States,* 718 A.2d 532, 545, 546 n. 8 (D.C. 1998) (per curiam) (Ruiz, J., concurring); *see also id.* at 546 n. 8 (agreeing with Judge Schwelb that evidence of lack of consent "is also probative of the other side of the same coin, the accused's intent to use force" in a sexual encounter).[20] In short, by raising a consent defense, appellant did not merely "place[ ] the complainant's intent in question," as he claims; he also placed squarely in issue his own intent to use force.[21]

In each of the cases on which the trial court relied in ruling that J.W.'s testimony would be admitted—*Crisafi, Calaway,* and *Dyson*—this court held that because the different sexual-assault incidents described in the opinions involved similar factual circumstances, evidence of one completed or attempted sexual assault by the defendant was admissible to prove the defendant's intent to commit sexual assault in another (or other) incident(s). In *Crisafi,* where the issue was denial of a motion for severance, Crisafi raised a consent defense to the charge that he raped one complainant and, as to the charge of assault with intent to rape a second complainant, claimed that the second complainant had attacked him during an argument over politics. *See* 383 A.2d at 5. We held that if Crisafi "had been tried separately on each charge, evidence of the rape of one complainant would have clearly been admissible to show criminal intent on his part when he struck the other complainant and tore her clothing in the assault with intent to commit rape." *Id.* at 5.

In *Calaway,* the issue was admissibility of testimony about a prior assault in which Calaway told the complainant hotel night clerk to take her clothes off and then knocked her onto the bed in the room she was showing him and climbed on top of her. *See* 408 A.2d at 1225–26, 1226 n. 9. We held that the trial court did not abuse its discretion in admitting evidence of that sex-related assault to prove Calaway's intent in attacking another woman whom he had contacted under the ruse of looking for a room to rent. *Id.* at 1226–27. We

**19.** The trial court instructed the jury that to prove appellant's guilt of first-degree sexual abuse, the government was required to prove that J.S. "did not voluntarily consent to the sexual act." "Consent by the victim is a defense to a prosecution under § [ ] 22–3002...." D.C.Code § 22–3007 (2001).

**20.** *See also Hatch v. United States,* 35 A.3d 1115, 1122 (D.C.2011) (stating that "consent is synonymous with the absence of force," and that (except perhaps in cases involving sado-masochistic sex) "[a] finding that the defendant used force is logically incompatible with a finding that the victim consented").

**21.** *Cf. State v. Oliver,* 133 N.J. 141, 627 A.2d 144, 152 (1993) ("When a defendant claims that he penetrated with permission, he puts his own state of mind in issue: he argues that he reasonably believed that the alleged victim had affirmatively and freely given him permission to penetrate. The State, therefore, can introduce evidence to disprove that the defendant had that state of mind."); *Martin v. State,* 173 S.W.3d 463, 467 n. 1 (Tex.Crim. App.2005) ("When the defensive theory of consent is raised, a defendant necessarily disputes his intent to do the act without the consent of [the complainant]. His intent is thereby placed in issue.").

Appellant argues that his intent was not in issue because if the jury believed he threatened J.S. with a gun, "the only reasonable inference was that he intended to force her to submit to sex." But, of course, the jury was not required to believe that appellant acted by threat in his encounter with J.S.; the government's burden was to prove that allegation beyond a reasonable doubt.

reasoned that in light of the "significant similarities in modus operandi," testimony about the prior assault was "probative of appellant's motive and intent in attacking [the second woman,]" *id.* at 1226, and that "[t]he jury could have concluded, based on the similarities with appellant's prior attack, that he had a similar purpose here." *Id.* at 127.

In *Dyson*, the issue was the trial court's failure to sever a charge based on a March 15 sexual assault of one complainant from charges based on the alleged first-degree sexual abuse of two other complainants on March 17. *See* 848 A.2d at 612. Agreeing with the trial court that there were similarities between the incidents (including that the defendant "made a friendly approach to the women" in "the same Mazda MPV vehicle," "followed by the use of force both times"), we "[could] not say that the trial court abused its discretion by admitting evidence of both incidents," both because the identity of the defendants was an issue initially and because "defendants' intent to have sexual contact was relevant to the issue of consent." *Id.* at 614.

Appellant disparages the trial court's and the government's reliance on the foregoing precedents. He stops short of characterizing as *dictum* the statements in those cases about the admissibility of the other-sexual-assault evidence under the *Drew* "intent" exception,[22] but asserts that each was "decided principally as an identity case," that *Crisafi* and *Calaway* are

"best understood, on their facts, as signature crime cases," and that this court's statements in each of the cases regarding the admissibility of other-sexual-assault evidence to prove intent were made "as an afterthought" and "without any analysis [or] citation." We reject those characterizations. The opinion in *Crisafi* specifically explains why the evidence at issue would have been admissible to show criminal intent, *see* 383 A.2d at 5; *Calaway* reasoned that the "significant similarities in modus operandi" that justified admission of the evidence as proof of identity equally justified admission of the evidence as probative of intent, *see* 408 A.2d at 1226;[23] and the discussion in *Dyson* about admissibility of the prior-sexual assault evidence under the "intent" exception covers the better part of two pages. *See* 848 A.2d at 613–14. Appellant also attempts to distinguish these precedents on the ground that—unlike here—in both *Crisafi* and *Calaway*, the defendants were charged with a specific-intent crime (assault with intent to commit rape). Because *Crisafi* and *Calaway* each disclaimed the requisite specific intent, appellant concedes, evidence of their other sex offenses might have been probative of intent.[24]

We think that neither *Crisafi* nor *Calaway* (nor *Dyson*) can meaningfully be distinguished from this case on the basis of whether the government was required to prove specific intent. For *Drew* "intent" exception purposes, "[t]he materiality of

22. We are satisfied that the holdings described in the text above were not dictum. *See United States v. Title Ins. & Trust Co.*, 265 U.S. 472, 486, 44 S.Ct. 621, 68 L.Ed. 1110 (1924) (" '[W]here there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter [dictum], but each is the judgment of the court, and of equal validity with the other.' ").

23. It was only in *Crisafi* that we observed that the "unusual factual similarities between the two offenses" "present[ed] virtually a textbook illustration of a signature crime," making the offenses mutually admissible to show identity as well as intent. 383 A.2d at 4.

24. As to *Dyson*, in which the charges—two counts of first-degree sexual abuse—did not involve a specific-intent crime, appellant dismisses the opinion as having "merely cit[ed] *Crisafi* without any analysis."

intent as an issue depends, not on the statutory definition of the offense, but on the circumstances of the case and on the nature of the defense." *Thompson,* 546 A.2d at 422. As already described, appellant's defense, which his counsel raised in her opening statement ("This case is about two people who met at a bus stop and decided to have sex, consensual sex[ ]"), was that he did not have the intent to engage in sex with J.S. by force. Therefore, evidence tending to prove that appellant did intend to engage in sex by force was as material in this case as in the precedents discussed above.

 The more difficult question is whether the testimony about appellant's having sexually assaulted J.W. was "logically relevant to prove [intent] for a reason other than its power to demonstrate criminal propensity," [25] or, stated differently, whether the testimony had probative value regarding appellant's intent vis-à-vis J.S. in a way that did not depend "wholly or primarily on the jury inferring" that appellant "was predisposed or had a propensity to commit the charged crimes." *Harrison v. United States,* 30 A.3d 169, 178 (D.C.

2011) (internal quotation marks omitted). We think J.W.'s testimony did have such independent probative value.[26] J.W.'s testimony informed the jury that once in the past, when appellant (friendly at first, but then aggressive and persistent) approached a woman awaiting transportation on an isolated street near an abandoned building of which he had prior knowledge, his eventually revealed intent was to engage in sexual acts by threats and force, after which he resumed speaking to the woman in a non-aggressive and apologetic or remorseful manner. If credited,[27] J.W.'s testimony made it more likely,[28] and permitted the jury to infer, that appellant had the same intent when (as was undisputed) he approached J.S. in a friendly manner while she was alone at a bus stop and ended up in a nearby abandoned building, where the two engaged in sexual acts (acts that J.S. testified were forcible and were followed by appellant's "turn[ing] back pleasant" again, worrying, and exhibiting concern for J.S.).[29] The testimony was not "probative with respect to intent only after an inference of predisposition has been drawn," *Thompson,* 546 A.2d at

25. *Roper,* 564 A.2d at 731.

26. Appellant contends that our recent opinion in *Robles* forecloses that conclusion. However, as we specifically stated in *Robles,* we had no occasion in that case "to consider the ... admissibility under *Drew* of separate *forcible* acts against different complainants." 50 A.3d at 494 n. 7 (italics added) (citing *Crisafi,* 383 A.2d at 5).

27. We say "if credited" because the jury did not learn that a trier of fact had found appellant guilty beyond a reasonable doubt of the first-degree sexual abuse of J.W. (or that appellant unsuccessfully asserted a consent defense in that case as well). As the trial court instructed, the jury had to decide whether to credit J.W.'s testimony, which the defense argued was fabricated and sought to impeach in numerous ways.

28. "[T]he ultimate inference generated by other crimes evidence must always be the defendant's greater likelihood of guilt on a contested issue in the case." *Ali v. United States,* 520 A.2d 306, 311 (D.C.1987).

29. Appellant argues that the prosecution did not "articulate a theory by which evidence of the assault on [J.W.] in 2000 would elucidate [appellant's] ... intent with respect to [J.S.] in 2006." Whether or not that is so, the trial court understood the logical relevance and probative value of J.W.'s testimony on the issue of intent. The court grasped the logic that in "approaching [J.S.] at the bus stop" and similarly "approaching [J.W.] trying to hail a cab ... [appellant's intent on both occasions] was not just to make conversation with a pretty woman, ... but ... to target a victim of sexual abuse."

421; rather, its probative value rests on a recognition that:

> [I]f a person acts similarly in similar situations, he probably harbors the same intent in each instance, and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.

*People v. Gallego,* 52 Cal.3d 115, 276 Cal. Rptr. 679, 802 P.2d 169, 195 (1990) (citation and internal quotation marks omitted); *see also Commonwealth v. Gollman,* 436 Mass. 111, 762 N.E.2d 847, 851 (2002) (same) (quoting *People v. Thompson,* 27 Cal.3d 303, 165 Cal.Rptr. 289, 611 P.2d 883, 891 (1980)); *Commonwealth v. Helfant,* 398 Mass. 214, 496 N.E.2d 433, 442 (1986) (same).

The trial court employed essentially the same reasoning when it ruled that J.W.'s testimony would be admitted. The court found that the two incidents described were

> quite, quite similar in that the defendant approached a person waiting for transportation on the street, initially asked her to have sex with him or date him, and then at gunpoint or at threat at the use of a gun took her to a location—and this, I think, is quite significant—an abandoned location in each case which the defendant apparently had designated ahead of time and preordained the location of this planned assault[.]

The court's observation about the similarities in J.S.'s and J.W.'s accounts[30] explains why this not a case in which "[t]here is no real connection between the two offenses other than the allegation that they both spring from the defendant's predisposition to" commit sexual assault. *Thompson,* 546 A.2d at 427. It is, rather, a case in which "intent as an issue can be distinguished from predisposition to commit the crime[.]" *Id.* at 421.

### B. Whether J.W.'s testimony was admissible under the "motive" exception

The discussion above explains why we conclude that J.W.'s testimony was admissible under the *Drew* "intent" exception. It does not end our analysis, however. While we conclude that J.W.'s testimony was probative on the issue of intent and thus was relevant for a non-propensity purpose, we also are concerned that the court's instructions may have caused jurors to understand that they could use the testimony for an impermissible purpose.

■ Before J.W. completed her testimony, and again during jury instructions, the court instructed the jury:

> You have heard evidence that the defendant previously had sexual contact with [J.W.] by force and without her consent. It is up to you to decide whether to accept that evidence. If you find that the defendant previously had sexual contact with [J.W.] by force and without her consent, *you may use this evidence only for the limited purpose of deciding whether the defendant had a motive*

---

**30.** While the trial court found the accounts "quite, quite similar," it is worth noting that "courts have repeatedly held that the degree of similarity required to establish identity based on modus operandi is greater than the degree required to negate innocent intent." *Diffee v. State,* 319 Ark. 669, 894 S.W.2d 564, 567–68 (1995) (quoting Edward J. Imwinkelried, Uncharged Misconduct Evidence § 3.11, at 23 (1984)); *see also, e.g., People v. Ross,* 395 Ill.App.3d 660, 335 Ill.Dec. 47, 917 N.E.2d 1111, 1126–27 (2009); *People v. Rath,* 44 P.3d 1033, 1039, 1042 (Colo.2002).

*and/or the intent to have sexual contact with [J.S.] by force or without her consent, as is charged in this case.* You may not use this evidence for any other purpose.

... The defendant is not charged in this case with any offense relating to his contact with [J.W.] in the year 2000, and you may not use this evidence to conclude that the defendant has a bad character or that the defendant has a criminal personality. The law does not allow you to convict a defendant simply because you believe he may have done bad things not specifically charged as crimes in this case.

Thus, through the language we have italicized above, the court told the jury that they were permitted to use the evidence about appellant's previous forcible sexual encounter with J.W. for the purpose of deciding whether appellant had a "motive" to have sex with J.S. by force. Our case law instructs, however, that the admissibility of other crimes evidence under the *Drew* "motive" exception "depends on the identity of the parties, i.e., on the fact that the defendant had a motive to harm this particular victim, with whom he already had an established relationship." *Hill v. United States,* 600 A.2d 58, 62 (D.C.1991). That is, the "motive exception ... allow[s] evidence of past hostility between the defendant and the victim to be admitted as proof of a motive to commit the particular hostile act against the same victim for which the defendant is on trial." *Id.; see also Harrison,* 30 A.3d at 177 n. 14 ("Usually, the key to admissibility under the motive exception ... is the fact that the defendant's prior ... conduct was directed toward the same victim.") (quoting *Hill,* 600 A.2d at 62 (internal quotation marks omitted)). The "specificity of the motive is of critical importance, because 'the more common or generalized the motive evidence, the more it verges upon

inadmissibility as mere propensity evidence.'" *Harrison,* 30 A.3d at 178. As we explained in *Harrison,*

> If, for instance, in a sexual assault prosecution, evidence of prior bad acts against other victims is introduced to show the defendant's desire to engage in heterosexual sex, the motive is indistinguishable from predisposition—for such evidence to be relevant, the jurors must infer the defendant's general sexual desire from the prior bad acts, and then infer that he acted in conformity with that desire and committed the charged sexual offense. As a rule, it is improper to offer prior instances of the same offense [against persons other than the victim in the instant case] to show motive, since such acts are relevant only by relying on the improper inference that the defendant has a propensity to engage in that conduct.

*Id.* (internal quotation marks omitted). We held in *Harrison* that it was error to allow the evidence of Harrison's prior sexually-oriented remarks to teenaged girls other than the second-degree-child-sexual abuse complainant as evidence that Harrison "was motivated to engage the complainant ... in a sexual relationship," because the evidence invited the jury to infer that Harrison "had a sexual interest in teenage girls, and ... that he acted in conformity with that bad character trait by committing the charged offenses against" the complainant. *Id.* at 175, 180. We could "not perceive how else the jury could have used the evidence," and we concluded that the court's instruction that the jury could not consider the evidence "to conclude that the defendant has a bad character or ... criminal personality" was "not curative." *Id.* at 176, 180.

We similarly conclude here that the trial court's "motive" instruction would have al-

lowed the jury to infer from J.W.'s testimony that appellant was motivated to commit sexual assault against J.S., with whom he had no previous relationship, a motive that is "indistinguishable from predisposition." *Harrison*, 30 A.3d at 178. We recognize that this court has sometimes used the terms "motive" and "intent" interchangeably [31] (and that, as we observed in note 13 *supra*, the trial court appears to have done the same in some of its colloquies with counsel). But the instruction to the jury told jurors that they could consider J.W.'s testimony for the purpose of deciding whether appellant had "a motive and/or the intent" to have sexual contact with J.S. by force or without her consent. Taken literally, the "and/or" phrasing would have conveyed to jurors that "motive" and "intent" are different and that

jurors were permitted to consider the evidence about appellant's sexual assault of J.W. as "motive" evidence alone [32] and not necessarily as intent evidence.[33]

Through a limiting instruction, the court also told jurors that they could not use the other-crimes evidence to conclude that appellant has a "bad character" or a "criminal personality." Although the court gave that limiting instruction immediately after giving the "motive and/or ... intent" instruction, appellant argues that, as in *Harrison*, the "limiting instruction did not cure the harm," because the court "failed to provide the jury any guidance on how it could draw the link between the assault on [J.W.] and the alleged assault on [J.S.] without resorting to an impermissible propensity inference." We likewise are not persuaded that the limiting instruction,

**31.** *See, e.g., Crisafi*, 383 A.2d at 5 (stating that "[*m*]*otive* was at issue" because Crisafi's "defense at trial was that one complainant consented to have sexual relations with him" and the other "physically attacked him during an argument over politics," and concluding therefore that if Crisafi "had been tried separately on each charge, evidence of the rape of one complainant would have clearly been admissible to show criminal *intent* on his part when he struck the other complainant and tore her clothing in the assault with *intent* to commit rape") (italics added); *Calaway*, 408 A.2d at 1226–27 (reasoning that "evidence of prior conduct is relevant when specific *intent* is in issue" and concluding therefore that testimony about a prior rape "was probative of appellant's *motive and intent* in attacking" the second complainant) (italics added).

**32.** "While motive is the inducement to do some act, intent is the mental resolution or determination to do it." Black's Law Dictionary 825 (8th ed.2004).

**33.** During the court's colloquy with counsel about jury instructions, the court told defense counsel, "in drafting the instructions [regarding the permissible use of J.W.'s testimony], I had it a[s] motive and intent." The court acknowledged, however, that appellant (having failed to persuade the court that J.W.'s testimony should not be admitted at all) "did

request that the other crimes instruction mention only intent." The court's comment appears to have been a reference to appellant's arguments, set out in his written opposition to the government's notice of its intent to introduce other-crimes evidence, that the motive and identity exceptions "are distinct and merit consideration separately," and that the admissibility of other-crimes evidence under the motive exception "depends on the identity of the parties, i.e., on the fact that the defendant had a motive to harm this particular victim, with whom he already had an established relationship." During the colloquy with the court, appellant's counsel again objected that this court's "case law on motive as an exception to other crimes is very specific" and, in particular, "requires specificity with regards to a defendant and a complainant." The trial court disagreed, stating that the government could argue that appellant's "actions, even before he ever had contact with the particular victim in this case, were evidence of his motive" and that the court would give the instruction it had drafted. On this record, we are satisfied that appellant preserved an objection that the court's instruction erroneously permitted the jury to consider the evidence about appellant's sexual assault of J.W. as "motive" evidence alone.

coming on the heels of the "motive" instruction, was "phrased in terms [through] which a jury [was] likely to understand" that it could not consider J.W.'s testimony as evidence that appellant was predisposed to engage in sexual acts by force. *Thompson*, 546 A.2d at 426.

### C. Whether J.W.'s testimony was substantially more prejudicial than probative

██ Upon the foregoing analysis, our conclusion is that the trial court admitted J.W.'s testimony for both a permissible purpose and for a purpose that, as described to jurors, was impermissible. Our remaining task is to determine whether, in this circumstance, "the prejudicial impact of the evidence 'substantially' outweigh[ed] its probative value." *Bacchus*, 970 A.2d at 273.

We were presented with a similar situation in *Calaway*. We noted in that case that the trial court not only had properly admitted evidence of a prior rape for the purposes of proving intent and identity, but also had erroneously admitted the evidence for the purpose of proving Calaway's "predisposition to gratify [his] sexual desires" with the complainant. 408 A.2d at 1227 n. 12. We were satisfied, however, that the error in admitting the evidence for that improper purpose was harmless since the evidence was admissible for the other proper purposes. *Id.*[34] We reach a similar conclusion here.

██ In ruling that J.W.'s testimony would be admitted to establish both intent and motive, the trial court "conclude[d]

specifically ... that the prejudicial effect does not substantially outweigh the probative value." As we have repeatedly recognized, "the evaluation and weighing of evidence for ... potential prejudice is quintessentially a discretionary function of the trial court," to whose decisions "we owe a great degree of deference." *Johnson v. United States*, 683 A.2d 1087, 1095 (D.C.1996) (en banc). Here, our deference must be tempered by a recognition that the trial court's weighing of prejudicial impact was likely affected by its view (reached without the benefit of this court's analysis in *Harrison*) that the evidence was properly admitted under the *Drew* "motive" exception. Since J.W.'s testimony was not legitimately probative of motive, logic compels us to conclude that the testimony's legitimate probative value was not as great as the trial court estimated. Nevertheless, we agree with the trial court that the probative value of J.W.'s testimony, as evidence of appellant's intent to have sex with J.S. by force when he had an encounter with her under circumstances similar to those J.W. described, was "very high."

██ "In deciding whether the danger of unfair prejudice and the like *substantially outweighs*" probative value, "a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which

---

**34.** Notably, we reached that conclusion even before we had adopted, in *Johnson v. United States*, 683 A.2d 1087 (D.C.1996) (en banc), "the criterion of Federal Rule of Evidence 403 ... that evidence otherwise relevant may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice," *id.* at 1095 n. 8 (emphasis added, brackets and internal quotation marks omitted)—a test that we expected would "further the policy of admitting as much relevant evidence as it is reasonable and fair to include" and would cause trial judges to "exercise their discretion to admit such evidence in some instances in which they otherwise might not do so." *Id.* at 1100.

the evidence probably will rouse the jury to overmastering hostility." *Id.* at 1095 n. 8 (quoting John Strong, 1 McCormick on Evidence § 190 (4th ed.1992) (emphasis in original)). In the discussion above, we addressed the first two of those enumerated factors, noting that the juvenile court found beyond a reasonable doubt that appellant committed the offenses J.W. described, and citing ways in which the circumstances of appellant's encounter with J.W. and the circumstances J.S. alleged were similar. As to the interval of time that elapsed between the crimes, we note that the six-year interval is shorter than the length of time between the "other crime" and the charged crime in *Calaway,* where there was an "eight-year gap between the two incidents." 408 A.2d at 1227. We reasoned that this did not significantly reduce the probative value of the other-crimes evidence because Calaway "was incarcerated for seven of the eight years between the incidents." *Id.* Here, the several-year gap between the incidents involving J.W. and J.S. was similarly explained by the fact that appellant was incarcerated for a portion of that time period.

Regarding the efficacy of alternative proof, the evidence in this case pertinent to whether appellant intended to engage in sexual acts with J.S. by force was essentially J.S.'s word that he did so versus Armstrong's testimony that J.S. admitted fabricating a claim of sexual assault. Although J.S. complained of some pain after the incident she alleged, she had no "obvious cuts or tears," and (as appellant argues) witnesses who observed her demeanor after the incident relied on her "subjective statements and representations." There was no more efficacious proof of appellant's intent in his encounter with J.S. than J.W.'s testimony describing appellant's similar encounter with her, which ended with appellant's sexually assaulting her.[35]

Finally, we consider whether the admission of J.W.'s testimony would likely have roused jurors to "overmastering hostility." *Johnson,* 683 A.2d at 1095 n. 8. We see no reason to reject the trial court's assessment that the prejudicial effect of J.W.'s testimony as evidence of appellant's *intent* would not have that effect; to the contrary, the "great degree of deference" we owe to the trial court's evaluation of evidence for prejudice, *Johnson,* 683 A.2d at 1095, seems to us to require that we accept the trial court's assessment of prejudice "except under the most extraordinary of circumstances,"[36] and that we find an abuse of discretion "[o]nly if the decision to admit evidence over a Rule 403 challenge is unsupportable when the evidence is viewed in the light most supportive of the decision...."[37]

The remaining consideration is whether jurors' (possible) consideration of J.W.'s testimony as evidence of appellant's *motive* would likely have led jurors to have "overmastering hostility" against appellant. It

---

**35.** In *Calaway,* we concluded that the admission of other crimes evidence was not reversible error even though there was other efficacious evidence of Calaway's intent to commit sexual assault, including evidence that Calaway had "fresh scratches on his neck" after the charged offense and certain statements Calaway had made to police that undermined the "reasonable possibility that [certain] facts could be explained innocently." 408 A.2d at 1223, 1225 n. 7.

**36.** *United States v. Love,* 134 F.3d 595, 603 (4th Cir.1998) (internal quotation marks omitted).

**37.** *United States v. Stewart,* 206 Fed.Appx. 924, 927 (11th Cir.2006) (internal quotation marks omitted); *see also United States v. Sumlin,* 271 F.3d 274, 283 (D.C.Cir.2001) (" '[I]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal[.]' ").

is difficult to see how the testimony taken as motive evidence would have added more than marginally, or very slightly, to its prejudicial effect. That is, we see no reason why jurors would have been appreciably more hostile to appellant upon inferring that he had a "generalized ... motive ... verg[ing] upon ... [a] propensity" [38] to commit forcible sexual assaults than they might have been upon accepting J.W.'s testimony as evidence that, on an occasion in the past, appellant demonstrated an intent to have forcible sex with a teenaged girl. For that reason, although J.W.'s testimony was admitted for both a proper and an improper purpose, we can say with "fair assurance ... that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[39]

### V. Conclusion

For the foregoing reasons, the judgment of conviction is

*Affirmed.*

---

**38.** *Harrison*, 30 A.3d at 178 (internal quotation marks omitted).

**39.** *See also id.* at 764, 66 S.Ct. 1239 ("If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand[.]").