*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-336

DEMETRIUS J. BANKS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-12148-15)

(Hon. José M. López, Trial Judge)

(Argued January 16, 2019                    Decided September 10, 2020)

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam* and *Shilpa S. Satoskar*, Public Defender Service, were on the brief, for appellant.

*Christopher R. Howland*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Jason Park*, and *Julianne Johnston*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, *Associate Judge*, and WASHINGTON and FISHER,[*] *Senior Judges*.

_____

[*] Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

FISHER, *Senior Judge*:  This case is about five robberies — two of which included sexual assault — and the law of severance.  Appellant Demetrius Banks was indicted on twenty-five counts related to five armed attacks which occurred within two miles of each other over a one-month period in the summer of 2015.  The charges included five counts of robbery while armed, four counts of kidnapping while armed, two counts of first-degree sexual abuse while armed with aggravating circumstances, and one count of assault with intent to commit first-degree sexual abuse while armed.  Appellant repeatedly moved to sever the counts so that he could have five separate trials, but the trial court denied those motions.  After a trial lasting more than three weeks, the jury found appellant guilty of twenty-three counts — including the robberies of all five women and both first-degree sexual assaults while armed.

Banks argues on appeal that (1) the two attacks that included sexual assaults (and robberies) should have been severed from the other three robberies, (2) the two sexual assaults should have been severed from each other, and (3) the three remaining robberies should have been severed from each other.  In other words, appellant argues that he should have received five separate trials.  We agree that the two robberies involving sexual assaults should have been severed from the other three robberies.  However, the trial court properly declined to sever the

sexual assaults from one another. Accordingly, we affirm all the convictions related to those two attacks.

We also agree that each of the remaining three robberies should have been severed for separate trials. Nevertheless, we affirm appellant's convictions related to the robbery of Dolores Rowen, whose stolen belongings were found in appellant's possession, because the failure to sever was harmless. We vacate the convictions related to the remaining two robberies and remand for two new trials.

## 1. Summary of the Five Attacks

T.C. walked home from the Fort Totten Metro Station around 10:30 p.m. on July 28, 2015. On Riggs Road, N.E., she noticed a man who appeared to be talking on his phone while standing in the driveway of a school. After T.C. walked past, he grabbed her arm from behind and pulled her toward him. T.C. felt a knife against her ribcage. When she asked if he was planning to kill her, the assailant said, "shut up or I will." As he forced her at knifepoint toward the back of the school, she offered her handbag but the man refused. Once they were behind the school, the assailant pulled down T.C.'s pants and penetrated her vagina with his penis as she leaned against a chain-link fence. T.C. offered to give up her phone,

but the assailant declined to take it. He then penetrated her again while she lay on the ground.

After completing the sexual assault, the assailant hugged T.C. and apologized to her. He directed her to take a photo of her ID with his phone and to tell him her phone number, which he later called twice and texted once. After briefly chatting, the assailant left on a bicycle.

T.C. got home and, while crying and gagging, called her friend to tell her that she had been raped. She then dialed 911 and went to a hospital, where an examination revealed a laceration to her vagina. DNA collected from a vaginal swab matched that of appellant. T.C. later realized that her SmarTrip card and cash were missing. She did not get a good look at her assailant's face but described him as a skinny black man with a beard, about six feet one or two inches tall. A review by a Metro detective determined that someone used T.C.'s stolen SmarTrip card on both August 2 and August 29. Surveillance footage from August 29 showed the use of the stolen card by a woman who was standing next to a man. Looking at a still photo "captured" from that video, Lerazia White, a former romantic partner of appellant, identified those two individuals as herself and

appellant; she also testified that appellant sometimes had given SmarTrip cards to her.

The second robbery took place shortly after midnight on July 31, 2015, as Sallay Manah walked home from the Fort Totten Metro Station. She passed a man standing in the front yard of a house on Gallatin Street, N.E., seemingly going to his car. The man ran behind her, grabbed her hard by the shoulder, dragged her into an alley, and pressed an object into her back. After Manah yelled "help!" and "rape!" the assailant threatened to kill her. They scuffled and Manah was hit in the lip. The assailant took Manah's handbag — he either demanded it or she offered it — and then told her to run in the opposite direction. The stolen bag included Manah's phone, SmarTrip card, and passport card.

Manah did not see the robber on a bicycle that night; however, she spotted the same person a few weeks later riding a bicycle in the neighborhood. When she saw a news story and read an article that featured a still image of appellant, she realized that he was her attacker. Manah described her assailant as a slim black man, about six feet tall, and in his early or mid-twenties.

At about 10 p.m. on August 4, 2015, Dolores Rowen walked home from the Fort Totten Metro Station. She saw a man walk toward her on the same side of Riggs Road, N.E. He grabbed her by the hair and placed a knife within inches of her throat. Rowen repeatedly screamed, "Take whatever you want!" The assailant responded, "come with me" and dragged Rowen toward a wooded area. She resisted him and fell to the ground. The man grabbed her purse, which included credit cards, a phone, her ID card, and a signed check, and walked away.

Rowen described her assailant as an "average to skinny-ish" black man, between six feet and six feet two inches tall, wearing black shorts and a white tank top. An eyewitness, Kathy Gomez, testified that she saw Rowen being robbed by a skinny black man with a beard and a white shirt. Rowen never identified appellant as her attacker and said she did not get a good look at his face. About an hour after the attack, Rowen's credit card was used at a 7-Eleven across the street from the Fort Totten Metro Station. Store surveillance footage showed a person using that card who generally matched Rowen's description of her assailant, although the person in the video wore a black shirt in addition to black shorts.

Tanya Bangura exited the Fort Totten Metro Station on the last Red Line train of the night, at about 3:30 a.m. on August 23, 2015. On her walk home, she

turned to see a man riding a bicycle. As he continued on that street, Bangura turned onto a path. Shortly after she reached Gallatin Street, N.E., and turned left, the same man approached her on foot from the opposite direction and blocked her way, repeatedly demanding that she hand over her belongings and grabbing at the phone in her hand. Because "something in the voice or his movement got me scared," Bangura testified, she threw her handbag toward the ground in one direction and walked away in the other direction, as she had seen in movies. But she soon returned and asked to retrieve her foreign passport, which she testified was difficult to replace.

For the first time, Bangura saw a knife in the man's hand. The assailant opened her bag and the two briefly looked inside it. After neither saw Bangura's passport at first, the man said, "let's go over here," pointing to nearby bushes. Bangura declined, quickly found her passport, and walked away. She recalled that her assailant was a black man who wore a gray sweatshirt, gray pants, and a black hat. When police showed her a photo array of potential assailants, which did not include appellant, Bangura vacillated between two people but did not choose either. Several days later, her sister forwarded a video featuring appellant. Bangura's sister told Bangura that her husband thought that the person in the video might be Bangura's assailant. Bangura knew "[w]ithout a doubt" that the person in

this video had attacked her because of the way he moved, walked, and "hitch[ed]" his pants. The related article's description of a black man between six feet and six feet two inches tall in his twenties or thirties with facial hair matched her recollection of the assailant.

The fifth attack took place just after midnight on August 28, 2015. As S.T. walked home from the Brookland-CUA Metro Station, one Red Line stop south of Fort Totten, she began smoking a marijuana joint. She then saw a man pass her on a bicycle and soon after noticed the same person enter the driveway of a house on Michigan Avenue, N.E. Just as S.T. walked by the driveway, the man moved toward her and grabbed her right arm from behind. The assailant pulled S.T. into the driveway and she screamed for help. He told her to stop yelling or he would kill her. After the assailant demanded that S.T. hand over her belongings, she gave him her handbag (which included a wallet with credit and debit cards). The man grabbed S.T.'s phone and SmarTrip card and asked for her cash. He again threatened to kill S.T., who saw that he held a knife.

The man dragged S.T. further into the driveway and forced her to face a brick wall. He pulled down her pants and penetrated her vagina with his penis as she leaned against the wall, eventually ripping the buttons off her shirt and fully

undressing her. Next, the assailant ordered S.T. to put her shirt on the ground and lie on top of it. In order to cause a distraction, S.T. pretended not to understand the assailant's demand and asked him instead to move the shirt himself. As the assailant picked up the shirt, S.T., who was still naked, started running toward the street. The man grabbed her left arm, but S.T. broke free. She reached the middle of the road, turned right, and screamed, "I was raped[!] Help[!] Someone call the police[!]" T.S. spotted a police car within twenty or thirty seconds, by which point her assailant already had biked away in the opposite direction.

An ambulance took S.T. to a hospital, where a nurse documented a laceration to the victim's vagina. DNA collected from S.T.'s genital area matched that of appellant. S.T. described her assailant as a six-foot, slim black man in his late twenties or early thirties with a "thin mustache, goatee kind of trim," although she did not identify her attacker in a photo array that contained appellant's picture. Within approximately one hour, S.T.'s stolen debit card was used at two 7-Eleven stores and a gas station, all nearby in Maryland.

Police obtained 7-Eleven video surveillance footage of a man using S.T.'s stolen card and provided it to local television stations, which broadcast the video on September 1, 2015. After receiving multiple tips from the public, the

Metropolitan Police Department obtained a warrant for appellant's arrest on September 3, 2015. Appellant was arrested the next day and agreed to speak with detectives. When police searched appellant's bedroom and storage unit while executing a search warrant, they found Rowen's credit cards, ID card, and check as well as S.T.'s wallet. They also discovered a pocketknife in Banks's pants pocket and a cellphone that contained a saved picture of T.C.'s driver's license and records of calls and a text to her.

In his statement to police, appellant acknowledged having sex with T.C. but at first denied taking her money or SmarTrip card. When detectives told appellant that there was video evidence of him using T.C.'s card, he became more equivocal. Appellant also told police that S.T. initiated a sexual interaction with him but that they got into an argument and never engaged in sex; he admitted that he stole S.T.'s phone and wallet. Although the parties discussed the videotaped statements during pretrial motions, the statements were not admitted at trial.

## II. Appellant's Severance Motions

In a pretrial motion, the defense argued that the five attacks were improperly joined and moved to sever the counts for five separate trials. The government

opposed the motion, asserting that the evidence of each attack would be admissible at separate trials. The trial court agreed with the government, ruling that the evidence of other crimes could be admitted under the "identity" and "intent" exceptions of *Drew v. United States*, 331 F.2d 85, 90 (D.C. Cir. 1964).

Judge José M. López first ruled that joinder of the offenses was proper, under Super. Ct. Crim. R. 8(a), and then denied the defense motion to sever under Super. Ct. Crim. R. 14. Citing this court's case law, which we discuss below, the trial court found the five events to be mutually admissible to prove identity because there was a "reasonable probability" that the same person had committed each of the crimes. The government also argued that the incidents were mutually admissible because appellant had harbored the same intent to use force when committing the sexual assaults as well as the robberies without sexual assaults.[1] Judge López agreed, stating that a "common denominator" established "a probative value that the assailant harbored the same intent in each instance." He ruled that the evidence would be mutually admissible under the intent exception to *Drew*,

---

[1] Evidence that appellant "used force and violence to assault other women walking home from the same metro station and take property from them against their will," the government argued, "provides evidence that the defendant intended . . . to use force and violence to cause [T.C.] and [S.T.] to engage in sexual acts against their will."

"not for predisposition but for the proposition that a person acts similar in similar situations," citing *Legette v. United States*, 69 A.3d 373 (D.C. 2013).

Banks filed a supplemental motion to sever, arguing that he would be "embarrassed and confounded" in his defense against multiple charges. Appellant wanted to raise a consent defense in the cases of T.C. and S.T. — whom he would admit to robbing — but said this testimony would "prove devastating" to his claim that the other three robbery victims had misidentified him. In support of this motion, appellant's counsel addressed whether Banks had proffered enough information about his testimony. He stated: "[E]veryone in this room already has a pretty decent idea of what Mr. Banks would say because we've all seen his videotape statement about meeting the complainants and his interactions with them." When asked by the trial judge to summarize that statement, counsel responded:

> [H]e meets the complainants at or near the Metro station. They talk. They interact. They agree to engage in sex. And in both situations — well, I think how he says both situations ends is slightly different, but he goes through the details of meeting them, them having an agreement to engage in consensual sex and then things ending — I know with the August 28th, he talks about things and them getting into a disagreement, and he acknowledges taking that complainant's property without permission.

The trial court denied this supplemental motion to sever, too.

In so ruling, Judge López explained that there was not a "strong showing" regarding the consent defense. First, he said the responses of T.C. and S.T. to the offer of HIV medication[2] showed that their consent to unprotected sex with a stranger was "highly inconceivable," adding that the "tone of the voices in the 9-1-1 calls, the reality of the excitement belies . . . consent." He expounded:

> Particular emphasis is made on the image of a naked woman in the middle of the street screaming that she was raped. It is also highly incongruous that from consent to sex there is an admitted robbery. Finally, we have the great improbability that women, coming home late at night, most likely exhausted from work, would consider a sexual encounter at . . . that time of day and location with a total stranger.

The court also denied two more defense motions to sever made during the trial.

---

[2] Hospital nurses offered medicine to T.C. and S.T. to help prevent HIV infection. After hearing about the possible side effects, T.C. accepted the medication. S.T., who was told that the HIV transmission rate was less than one-tenth of one percent "under the circumstances that she had experienced," declined the prophylactic medication.

At trial, the government generally presented its evidence of the five attacks in chronological order but acknowledged this was not always possible. Before deliberations, Judge López instructed the jurors to consider the evidence of each offense and each date separately. He also created separate verdict forms for the charges related to each of the five victims.

The jury convicted appellant of all counts except the charges of assault with intent to commit sexual abuse of Rowen (for which the trial judge granted a judgment of acquittal) and assault of Bangura with a dangerous weapon. Banks does not argue on appeal that the counts were improperly joined but rather that the trial judge should have severed them even if joinder was proper.

## III. Analysis

Before the trial, appellant argued that severance was required because his defense would be confounded by a joint trial and the jury would cumulate the evidence of his guilt. We review the trial court's decision to deny severance for abuse of discretion. *Tornero v. United States*, 161 A.3d 675, 681 (D.C. 2017). Appellant "must show the most compelling prejudice, from which the court would

be unable to afford protection if the offenses were tried together." *Id.* at 682 (citation omitted).

In analyzing whether or not severance was required, we must remember the long standing principle "in our law that evidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew*, 331 F.2d at 89. However, other-crimes evidence may be offered "when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan . . . and (5) the identity" of the perpetrator. *Id.* at 90.[3]

---

[3] This court uses a four-part test to determine the admissibility of other-crimes evidence:

> (1) there must be clear and convincing evidence that the defendant committed the other offense; (2) the other crimes evidence must be directed to a genuine, material and contested issue in the case; (3) the evidence must be logically relevant to prove this issue for a reason other than its power to demonstrate criminal propensity; and (4) the evidence must be more probative than prejudicial.

*Roper v. United States*, 564 A.2d 726, 731 (D.C. 1989) (per curiam) (internal citations omitted). "Regarding the last factor, the appropriate balancing test is whether the prejudicial impact of the evidence 'substantially' outweighs its probative value." *Bacchus v. United States*, 970 A.2d 269, 273 (D.C. 2009) (quoting *(William) Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc)).

## A. The Two Rapes (And Attendant Robberies) Should Have Been Severed From The Other Three Robberies

### 1. The Identity Exception Was Inapplicable

We begin by considering if it was an abuse of discretion for the trial court to try all five robberies (and the attendant charges) together. We conclude that it was.

In arguing that all five robberies should be tried together, the government relied on the identity exception to *Drew*, asserting that evidence would be mutually admissible at five separate trials. Under the identity exception, other-crimes evidence must create "a reasonable probability that the same person committed [the] crimes due to the concurrence of unusual and distinctive facts." *Gray v. United States*, 147 A.3d 791, 799 (D.C. 2016) (quoting *Easton v. United States*, 533 A.2d 904, 907 (D.C. 1987)). "However, the similarities between crimes must go beyond the commonplace and remain meaningful even when measured against the differences." *Id.* Moreover, "[w]e 'consider the totality of the factual circumstances' in determining whether there is 'a sufficient basis for admission under the *Drew* doctrine.'" *Thomas v. United States*, 59 A.3d 1252, 1260 (D.C. 2013) (quoting *Easton*, 533 A.2d at 907). This comparison of the circumstances

includes how each event unfolded. *See, e.g.*, *Easton*, 533 A.2d at 909 (holding that "the markedly different courses" of two robberies of cab drivers were "[e]specially significant" to this court's conclusion "that the combinations of circumstances surrounding the respective crimes [did] not create a reasonable probability that the same person committed both offenses"); *Thomas*, 59 A.3d at 1262 (holding that, despite similarities, sexual assaults of two young men were "qualitatively different" from each other).

Although there were many similarities among these five attacks upon women walking from the subway late at night, we agree with appellant's argument that the "signature crimes" exception did not permit the joint trial of *all five* of these criminal assaults. The trial judge should have severed the three robberies without sexual assaults from the rapes and robberies of T.C. and S.T.

The most obvious difference among the five assaults was that T.C. and S.T. were raped. The government argues that the other three robberies had "clear sexual overtones," but that characterization is exaggerated. Manah screamed "rape" after her attacker grabbed her, but appellant was not charged with sexually assaulting her or attempting to do so. The only conduct by Bangura's assailant that hinted at a sexual motivation was his suggestion when searching for her passport to

"go over here," gesturing to nearby bushes.  Regarding the assault of Rowen, the court found that there was insufficient evidence to present the jury with the only sex-related charge (assault with intent to commit first-degree sexual abuse while armed).

The government emphasizes the parallels between this case and *Coleman v. United States*, 619 A.2d 40 (D.C. 1993), in which we affirmed the denial of a motion to sever four robberies.  The other-crimes evidence was admissible to prove identity due to a variety of reasons:

> Each of the criminal events involved a man with a bicycle, except for [one] incident, where the perpetrator arrived in a vehicle [stolen earlier that night].  In each of the four cases, the assailant accosted a lone female victim by gaining access to a secured area of an apartment building after the victim opened the door with a key or access card.  The robber displayed a knife in three of the four robberies and threatened during the fourth incident that he had a knife. . . .  There were other similarities in the assailant's modus operandi, including his manner of approaching with the knife, the manner of lying in wait outside the locked buildings (except in one instance . . . ), and entering the buildings to commit the offenses.

*Id.* at 45 (footnote omitted).  It was also true, however, that "[t]he four incidences occurred within a two-day period; the first three, within less than eight hours; and all four, at locations in close proximity to each other."  *Id.* at 44–45.  Perhaps most

notably, the sexual assault of one victim was severed for a separate trial. *Id*. at 45 n.9.

In this case there was an obvious potential for prejudice from trying the rapes alongside the three other robberies. That potential became manifest when appellant asserted that T.C. and S.T. disavowed their consent to engage in sex because appellant had robbed them. To resolve the issue of mutual admissibility based on the identity exception to *Drew*, the key question is whether the circumstances surrounding the rapes were so distinctive that they created a reasonable probability that the same person robbed Rowen, Manah, and Bangura. Conversely, were the details of the three robberies admissible to prove that appellant was the man who raped T.C. and S.T.? Of course, appellant admitted that he engaged in sex with T.C. and S.T. He claimed, however, that he had not raped them.

Undoubtedly, there were similarities in all five attacks. A man assailed a woman late at night during a one-month period within a span of two miles and often, but not always, rode a bicycle, wielded a knife, and threatened to kill the victim. But there are numerous differences, some quite significant. For example, in three instances (the attacks on T.C., Manah, and S.T.), the perpetrator

maintained a ruse that he was occupied or standing in his driveway before grabbing the woman by surprise. But Rowen's assailant walked directly toward her on the same side of the sidewalk, and Bangura's assailant approached her straight-on and blocked her. Whereas the attacker rode away on a bicycle after assaulting T.C. and S.T., Rowen's assailant walked away after robbing her and Manah's assailant told her to run in the opposite direction. The robbery of Bangura was unique in that the man did not threaten to kill her or hold a weapon against her body, instead allowing her to walk away after she found her passport in the handbag. Likewise, only the robbery and sexual assault of T.C. ended with the assailant hugging and apologizing to the victim before ordering her to take a photo of her ID and contacting her later. The five attacks were not close enough in time and place, and the descriptions of the assailant were not so distinctive, as to outweigh the differences between these crimes. The rapes (and the attendant robberies) should have been severed from the three other robberies.

## 2. Appellant's Decision Not to Testify Does Not Require Reversal

Next, we must consider whether or not the trial court's decision to try all five crimes together so impaired appellant's ability to testify on his own behalf that we are required to vacate his convictions relating to T.C. and S.T..

A defendant "may be prejudiced if he is effectively compelled to testify on one count upon which he wishes to remain silent as a result of the joinder of several offenses for trial." *Roy v. United States*, 652 A.2d 1098, 1108 (D.C. 1995) (discussing *Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1964)). Here, of course, appellant was not "effectively compelled" to testify when he wanted to remain silent. He contends, rather, that he was prejudiced because he was effectively *precluded* from testifying about the sexual assaults. In light of our previous discussion, we do not need to decide whether appellant was entitled to severance on this ground as well. The question becomes whether we should reverse the convictions related to T.C. and S.T. because appellant did not testify at trial.

Appellant's brief states that he felt unable to testify about the two sexual assaults because he would admit to robbing those two victims while presenting a misidentification defense to the other three robberies. He also argues that he would have been exposed to impeachment with a conviction for armed carjacking as well as his incriminating statements to police, such as "I rob a lot of people." Appellant implies that these significant downsides of testifying would have been more acceptable to him if the charges of robbing three other women had been

severed for separate trials.  Nonetheless, Banks did refrain from testifying on those three other robberies, as he desired.  If he suffered prejudice from not taking the stand, it was because he did not present his consent defense to the two sexual assaults through his own testimony.

In this regard, the record establishes no more than harmless error under either traditional standard of review.  *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (holding that a non-constitutional error is harmless if one can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error"); *Chapman v. California*, 386 U.S. 18, 24 (1967) (holding that the standard for assessing the prejudicial impact of constitutional error is "harmless beyond a reasonable doubt").

Appellant asserts that there was constitutional error because he was unable to present "any counter-narrative" without having testified.  However, both the direct testimony of T.C. and S.T. and the skillful cross-examination by defense counsel provided evidence from which his counsel argued that the sexual encounters were consensual.  For instance, the defense directed attention to the oddity that T.C. gave her phone number to Banks and delayed telling the police

that appellant had called and texted her.  Banks's counsel emphasized in closing that the defendant had no burden and did not have to prove anything; rather, the government had to dispel all reasonable doubt.  The defense received its requested instruction on consent, see *infra,* note 5, and counsel effectively argued that defense in opening statement and closing argument.

Ultimately, we have no assurance that appellant would have testified had the robberies been severed.  Moreover, in his brief, appellant does not identify the "essential testimony" that would have given more credibility to his consent defense.  His trial counsel stated that both women fabricated the rapes because they were "embarrassed" about having consensual sex with someone who ultimately, as appellant concedes, robbed them, but the jury also heard vivid testimony from both victims that they were forced to have sex at knifepoint.  The jury also heard that, shortly after the attack, T.C. reported the rape to her friend (while crying and gagging) and then called the police and that immediately after she was assaulted, S.T. ran naked into the street and soon told a police officer that she had been raped.  Each woman went to a hospital, where an examination revealed a vaginal laceration.

Like the court in *Tornero*, we remain "unpersuaded" that the defense was prejudiced by a failure to sever "where appellant failed to present even a minimally compelling argument that might suggest [the victim's] motivation to fabricate a serious allegation of sexual assault." 161 A.3d at 687. Furthermore, although Banks chose not to testify, he managed to present his defense without exposing himself to cross-examination or to impeachment with his prior convictions and statements to the police. Therefore, appellant's argument fails under either standard for assessing harmless error.

## B. It Was Not an Abuse of Discretion to Try the Two Rapes (And Attendant Charges) Together

Banks argued in his pretrial motion, as he does here, that the two sexual assault cases should have been severed from each other because the prejudice of allowing evidence from the case of T.C. to be heard in the case of S.T. — and vice versa — substantially outweighed the probative value of that evidence.[4] *See Roper*, 564 A.2d at 731. We hold that the trial judge did not abuse his discretion in

---

[4] We note that, because the robberies were an integral part of his consent defense, Banks did not request that the trial court sever either sexual assault from the corresponding robbery. We therefore consider only if it was proper for the sexual assaults (and the corresponding charges) to be tried together.

ruling that the sexual assaults of T.C. and S.T. were mutually admissible under the intent exception to *Drew*.

Faced with DNA evidence that proved his sexual contact with T.C. and S.T., Banks decided to pursue a defense of consent. But doing so required him to explain why both women, who allegedly had agreed to have sex with him, would then claim that he had raped them. He sought to explain this change of attitude by admitting that he had stolen property from them. At trial his counsel asserted that both women lied about their lack of consent because they were "embarrassed," "regretful," and "resentful."[5] Because Banks admitted to engaging in sex on two occasions under similar circumstances but claimed that the victims agreed to the acts, the government had to prove the lack of consent by each complainant. In other words, its burden was to prove the defendant's "intent to use force" during the sexual encounter. *Legette*, 69 A.3d at 382 (citation omitted).

---

[5] In the pretrial motion to sever, defense counsel argued that Banks would testify in substantial conformity with his statement to police. Defense counsel's opening statement articulated a detailed story. Counsel said that T.C. flirted with appellant on her walk home, which led to consensual sex, appellant's robbery of T.C., and T.C.'s decision to fabricate the rape allegation. Counsel also said that appellant and S.T. flirted and shared a marijuana joint before engaging in consensual sex, after which appellant robbed S.T. and she falsely screamed that she had been raped. The trial court instructed the jurors that they "may consider evidence of consent" in deciding whether the government had proved the two sexual assaults beyond a reasonable doubt.

The resolution of this issue is informed by our opinion in *Legette*, which concerned an alleged sexual assault with many similarities to a previous sexual assault committed by the defendant. In both instances, the defendant allegedly approached a woman waiting for transportation, threatened her with a handgun when she declined, and took her to a pre-selected abandoned building to have sex. *See Legette*, 69 A.3d at 385. A conviction of first-degree sexual abuse requires "the intent to (1) engage in a sexual act (2) by force." *Id.* at 381. By raising a consent defense, we held, Legette denied using force, placing both parties' intent in issue. *Id.* at 381–82. Under the intent exception to *Drew*, therefore, the trial judge properly allowed testimony from the victim of the earlier sexual assault (for which appellant had been found responsible as a juvenile). *See id.* at 384–85. This court held that the testimony of the first victim had "independent probative value" that did not depend primarily on its use as propensity evidence. *See id.* at 384. "If a person acts similarly in similar situations, he probably harbors the same intent in each instance" and "such prior conduct may be relevant circumstantial evidence of the actor's most recent intent." *Id.* at 385 (brackets and citations omitted).

As in *Legette*, evidence from each of these two assaults had probative value that did not depend on a forbidden inference of criminal propensity. Through his

counsel's questions and arguments, appellant Banks asserted that he did not (and thus did not intend to) use force during his sexual acts with T.C. or S.T.; his counsel during opening statement characterized both sexual encounters as beginning with "chatting" and "flirting" and progressing to a mutual decision to "fool around." By contrast, the government introduced testimony from both complainants (and other evidence) that appellant forced them to engage in sex with him. For instance, both T.C. and S.T. testified that Banks used a ruse to surprise them, then grabbed them, and eventually threatened to kill them. Brandishing a knife late at night, appellant forced both women to go to a secluded outdoor area to have sex, they said.[6] Thus, T.C.'s testimony was not used to show that defendant was predisposed to commit sexual assault against S.T., or vice versa; rather, evidence from both cases "permitted the jury to infer" that appellant had the same intent to engage in sex by force — he was acting "similarly in similar situations." *See id.* at 384–85.[7]

---

[6] The evidence from both cases might ordinarily have been mutually admissible under the "identity" exception to *Drew* because the similarity of the crimes raised a reasonable probability that the same person committed each offense. However, since appellant conceded identity but presented a defense of consent, it appears that the other crimes evidence would not in this respect have been directed to a contested issue.

[7] Appellant argues that evidence of his state of mind held minimal probative value because the "central issue in the sexual assaults was whether the alleged acts of physical violence and threats occurred or were fabricated." He attempts to

(continued…)

Given appellant's defense of consent when charged with raping two women in similar circumstances, the holding of *Legette* justified the joint trial of the sexual assaults. However, the principle undergirding *Legette* is premised upon the interplay between the defense of consent and the defendant's intent to use force. It

_____

(…continued)

minimize the importance of *Legette*, instead relying on *Hatch v. United States*, 35 A.3d 1115 (D.C. 2011), in which the defendant asserted that he did not forcibly have sex with a prostitute because the accuser fabricated her claim that he threatened her with a gun. *Id.* at 1117. *Hatch* is distinguishable factually because both parties in that case acknowledged that the complainant had agreed to have sex with the defendant in exchange for cash. *See* 35 A.3d at 1121 n.17. However, the complainant testified that when she asked for payment in advance, the defendant pulled out a gun and demanded to have sex for free; by contrast, the defendant said that he paid the $60 they had agreed upon but, after they had completed the sexual acts, the complainant fabricated his use of a gun because he would not pay more. *See id.* at 1117, 1119. We held that the consent instruction should not have been given over the defendant's objection because Hatch's defense was limited to denying the victim's claim "that he forced her to perform sexual acts by threatening her with a pistol." *Id.* at 1121. He never asserted that she was "a willing participant *despite* his having held her at gunpoint." *Id.* (emphasis in original). This distinction mattered legally because a statute then required the defendant to prove the affirmative defense of consent by a preponderance of the evidence. *See id.* at 1120. We concluded that the instruction unconstitutionally shifted or diluted the government's burden of proof on the element of force. *See id.* at 1122.

By contrast, there was no burden shifting here. The court instructed the jury that it could "consider evidence of consent in deciding whether the Government has proved beyond a reasonable doubt that Demetrius Banks . . . used force." Appellant did not have the burden of proving consent. Rather, the government had to "prove beyond a reasonable doubt that [T.C.] and [S.T.] did not voluntarily consent to the sexual acts or contacts." Defense counsel specifically requested that the court issue such a jury instruction.

is not nearly as broad as the government urged in the trial court, and it does not support trying the three other robberies alongside the sexual assaults. If that more inclusive trial was proper, the denial of severance must have been soundly based on the court's alternative rationale — the identity exception to the *Drew* doctrine.

## C. The Remaining Three Robberies Should Have Been Tried Independently

### 1. The Identity Exception Did Not Apply

We now must consider whether it was an abuse of discretion to try the three other robberies together. Our analysis here is the same as the analysis we undertook in subsection A in concluding that these three robberies should have been severed from the two robberies involving sexual assault. Under the identity exception to *Drew*, in order for evidence to be mutually admissible, there must be "enough points of similarity in the combination of circumstances surrounding the [robberies of Rowen, Manah, and Bangura] to create a reasonable probability that the same person committed each." *Groves v. United States*, 564 A.2d 372, 376 (D.C. 1989) (internal quotation marks omitted) (quoting *Byrd v. United States*, 551 A.2d 96, 100 (D.C. 1988)).

We compared all five robberies in subsection A but reiterate here that among the attacks that did not involve sexual assault, the robberies differed in significant ways[8] that preclude us from concluding that the "signature crime" exception should apply — the three robberies should have been tried independently.

## 2. Failure to Sever the Counts Related to Ms. Rowen Was Harmless

Finally, we consider whether appellant's convictions related to Dolores Rowen should be affirmed despite the erroneous denial of severance. Only when "the exercise of discretion was in error" and "the impact of that error requires reversal" do we "hold that the trial court 'abused' its discretion." *(James) Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979). The court applies the *Kotteakos* standard of harmless error when other-crimes evidence was improperly admitted. *Thomas*, 59 A.3d at 1262; *Easton*, 533 A.2d at 909. It follows that a failure to

---

[8] Differences among the three robberies at issue in this section included: the time of each attack (10 p.m., midnight, and 3 a.m), the assailant's approach (waiting in the yard, approaching on foot, riding a bicycle), the initiation of the attack (grabbing the victim versus blocking her path), the use of a weapon (a knife in two cases and a non-sharp object in a third), the use of verbal threats, and how the attack concluded (physical attempt to get victim to a wooded area, verbal attempt to get victim to move to bushes, verbal instruction to the victim to flee).

sever is no more than harmless error when the government's evidence is overwhelming. *See Tornero*, 161 A.3d at 686–87.

We are persuaded that the judgment on the counts related to Rowen was not substantially swayed by the trial judge's decision not to sever them from the other four cases. Although appellant was charged with assaulting Rowen with intent to commit sexual abuse, the trial court granted a motion for judgment of acquittal. Appellant therefore was not prejudiced by being tried along with the rape charges. The question is whether being tried with the other charges of robbery substantially swayed the jury's decision to convict appellant of robbing Rowen.

On the night of August 4, 2015, appellant stole Rowen's credit cards, ID, and signed check; all of these items were discovered in appellant's bedroom or storage unit. Rowen's description of her attacker closely matched appellant's physical attributes. Further, video footage showed appellant (dressed in a black shirt — not a white shirt as reported by an eyewitness to the attack) using one of Rowen's cards at a 7-Eleven about an hour after the robbery. In closing argument, Banks did not assert that the video showed someone else using the card but argued

that he "perhaps" received the stolen items from somebody who attacked Rowen.[9]

Notwithstanding this entirely speculative argument, the evidence relating to this robbery was overwhelming. We therefore hold the error to have been harmless and affirm these convictions.

## V. Conclusion

For these reasons, we reverse the convictions on all counts related to Sallay Manah and Tanya Bangura and remand for new trials in each of those cases. In all other respects, we affirm.

---

[9] Defense counsel speculated: "[W]hat logically happens during that [one-hour] time period? Well, perhaps what really happens is that the person who robs Miss Rowen goes through her purse, takes the money, maybe gives the purse to Mr. Banks or maybe just drops it and Mr. Banks finds it, but that person doesn't want that stuff because that stuff is traceable. They take the cash, which is not traceable."