*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-219

STANLEY I. MOGHALU, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF1-13229-15)

(Hon. José M. López, Trial Judge)

(Argued December 12, 2019                    Decided November 18, 2021)

*Jonathan Zucker* for appellant.

*Anne Y. Park*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the briefs were filed, *Elizabeth Trosman*, and *Gilead Light*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY, *Associate Judge*, and FERREN and FISHER,[*] *Senior Judges*.

Opinion for the court by *Senior Judge* FERREN.

Concurring opinion by *Associate Judge* EASTERLY at page 38.

---

[*] Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

FERREN, *Senior Judge*: A jury found appellant, Stanley Moghalu, guilty of first-degree premeditated murder (with aggravating circumstances) and related charges for the shooting death of Ronald Smith and the non-fatal shooting of Charles Harrison.[1] Moghalu appeals several trial court rulings, made both before and during trial. For the reasons that follow, we reverse Moghalu's convictions and remand for a new trial.

## I.    Facts and Proceedings

According to the government's evidence, on November 14, 2011, Andre Hockaday took Smith and Harrison to 21st and M Street, Northeast, to purchase PCP. While there, Dwayne Williams approached Smith and shot him in the head to

---

[1] Moghalu was charged in an 11-count indictment with conspiracy to obstruct justice, D.C. Code §§ 22-722(a)(2)(A) (2012 Repl.), -722(a)(4), and -722(a)(6); first-degree premeditated murder while armed with aggravating circumstances, §§ 22-2101 (2021 Supp.), -4502 (2021 Supp.), and -2104.01(b)(9) (2012 Repl.); assault with intent to kill while armed, §§ 22-401 (2021 Supp.), -4502; aggravated assault while armed, §§ 22-404.01 (2021 Supp.), -4502; three counts of possession of a firearm during a crime of violence, § 22-4504(b) (2021 Supp.); unlawful possession of a firearm by a convicted felon ("FIP"), § 22-4503(a)(1) (2021 Supp.); obstructing justice (witness/officer), § 22-722(a)(2)(A); obstructing justice (injury/property damage), § 22-722(a)(4); and obstructing justice (due administration of justice), § 22-722(a)(6).

death, while Williams and a second gunman — allegedly Moghalu — shot Harrison several times (he survived). The shootings were apparently retaliation against Smith for "snitching" on David Warren, an incarcerated felon who was friendly with Moghalu, Williams, and Hockaday.[2] Moghalu was arrested in 2015 and charged in the shootings of Smith and Harrison.

Moghalu's jury trial began on September 25, 2017, on all counts except for the FIP charge,[3] which was tried by the court at Moghalu's request. On October 18, Moghalu was found guilty on all counts. On appeal, he contends that the trial court erred by: (1) requiring defense counsel to disclose to the government his third-party perpetrator ("*Winfield*") defense[4] before trial; (2) allowing the government to elicit lay testimony about Moghalu's bad character without a proper foundation; and (3) precluding recross-examination of a government witness.

_____

[2] Williams and Hockaday were arrested in 2014 and entered into cooperation agreements with the government, which required their pleading guilty to various charges related to the shootings.

[3] *See supra* note 1.

[4] *See Winfield v. United States*, 676 A.2d 1, 5 (D.C. 1996) (en banc) (evidence that third person committed crime charged is relevant and thus admissible at trial if facts or circumstances tend to indicate a "reasonable possibility" that such person committed charged offense).

## II.      Third-Party Perpetrator Defense

### A. Preface

We preface the discussion with a summary of our ruling. A third-party perpetrator (TPP) defense is an effort to demonstrate, through witness testimony, that "another person or persons committed the crime alleged,"[5] with admissibility committed to trial court discretion.[6] According to *Winfield,* resolution of TPP "admissibility questions . . . should normally be resolved as a preliminary matter before trial,"[7] in order to avoid unfair surprise and otherwise facilitate efficient trial court administration.[8] *Winfield*, however, did not mandate pretrial disclosure of a

_____

[5] *Id.* at 2 (footnote omitted).

[6] *See Jordan v. United States*, 722 A.2d 1257, 1262 (D.C. 1998) (referencing "trial court's discretion in this area"); *Winfield*, 676 A.2d at 5 (observing that "in the context of third-party perpetrator evidence, . . . the trial judge will have discretion to exclude marginally relevant evidence").

[7] *Id.* at 6 n.6.

[8] *See Jordan*, 722 A.2d at 1262 (discussing importance of court's exercising discretion to rule on proffered TPP defense, "at least provisionally, before trial begins," to avoid catching "the trial judge unaware").

TPP defense, let alone disclosure to the government (as the trial court ruled). Moreover, our *Bowman*[9] decision precludes court-ordered pretrial disclosure of any affirmative defense, absent a controlling statute, judicial decision, or Superior Court rule.[10] *Bowman*, however, does not preclude pretrial TPP disclosures to the trial court for discussion ex parte, or — if the defense agrees — to the government by way of a motion *in limine.*[11] Neither situation applies here. *Bowman*, accordingly, requires reversal.

**B. The Defense**

Approaching the court *ex parte* before trial, counsel for Moghalu announced that: (1) he "wanted to alert the Court" that he intended to elicit TPP evidence from a "cooperating witness" for the government, who "was on the scene"; (2) the cooperating witness and "X" (the putative TPP) were "very close" with a David

---

[9] *Bowman v. United States*, 412 A.2d 10, 11-12 (D.C. 1980) (per curiam) (reversing as a "usurpation of power" the trial court's *sua sponte* order that counsel disclose before trial "the general nature of the defense," absent a controlling statute, judicial decision, or Superior Court rule).

[10] *See supra* note 9.

[11] *See Winfield*, 676 A.2d at 6.

Warren, whom the cooperating witness and X wanted to protect from conviction of another murder "by eliminating the victim" in this case (later disclosed as Charles Harrison) "so he could not be a witness against Mr. Warren"; (3) thus, "for strategic reasons" counsel did not want to disclose the defense to the government before trial; and, in any event, (4) he did not think "pretrial clearance [of the TPP defense] is required." To which the judge replied, "I think I need to take a second look at *Winfield.*"[12]

The next day, after reviewing *Winfield*, the court said, "I think it would be appropriate and fair to give the Government an opportunity to have a say" on whether the TPP defense "should be permitted or not; in other words, it needs to be fleshed out." In particular, "as Winfield has said," the government should have "the opportunity . . . to rehabilitate its victim."[13]

_____

[12] *See supra* note 4.

[13] In granting the government "the opportunity . . . to rehabilitate its victim," the court presumably was referring to the government's possible "need to present 'rehabilitative' evidence [at trial] disassociating the victim from other persons allegedly harboring a motive to harm" the victim. *Winfield*, 676 A.2d at 5.

In response, counsel for Moghalu detailed his intention to ask Williams, a cooperating witness for the government, about "Jay Rock" (previously identified as "X"),[14] who was a friend of Warren and Williams, was "on the scene" when Williams and another shot Harrison, and fit the description of the second shooter "given by the surviving victim [Harrison] much more closely than does Mr. Moghalu." Counsel proffered that Jay Rock had the "same motivation to commit this murder as Mr. Williams did, i.e., loyalty to their mutual friend, David Warren." And, counsel again asked the court not to require disclosure of this line of questioning to the government, this time elaborating that he did "not want the Government to have the strategic advantage of preparing Williams for that cross-examination." Counsel suspected that Williams would "come up with a fabricated explanation of why it wasn't Jay Rock." Moreover, stressed counsel — without citing authority — "clearly, the defense is not required to disclose its defense." The court advised counsel that, "under Winfield, I believe you are required to disclose a third-party perpetrator," and that "the Government should participate in that discussion because [W]infield specifically says motivation is not enough."

_____

[14] The same individual is referred to interchangeably as "Jay Rock" and "J-Rock" throughout the proceedings.

Counsel agreed that "motivation isn't enough; you have to have opportunity" to commit the crime. But, he added, "[o]pportunity isn't going to be contested here because the Government's witness puts Jay Rock on the scene." Whereupon the trial court replied, "I've got to give the Government the opportunity to say that. Now you are arguing for them." Counsel responded, "I'm just making the representation. It won't be disputed that [W]illiams numerous times said Jay Rock was there." After which the court ruled: "I'm not going to permit it unless it is fleshed out, [and] the government has an opportunity to rebut it."

The *ex parte* proceeding ended; the prosecutors were called to the courtroom; the court explained that a pretrial TPP hearing would then take place; and the court concluded by saying: "[I]t's my belief, reading Winfield, that the Government should be permitted an opportunity to weigh in on whether this third-party perpetrator evidence should be presented." Left with no alternative, counsel for Moghalu spelled out his Jay Rock defense, after which the prosecutor said he would do some "digging" overnight to ascertain the government's position "with respect to the Winfield proffer."

Thereafter, on the first day of trial, the parties informed the court that, after discussing *Winfield*, they agreed that counsel would develop Moghalu's TPP defense

"through cross-examination of a government witness." According to its brief, the government has never disputed that "appellant's proffer satisfied the *Winfield* standard" — "an admittedly 'low bar' for admission."[15]

## C. Pretrial Disclosure to the Government

### 1. TPP Ruling as a "Preliminary Matter"

As we noted in *Winfield*, a TPP "issue arises at the intersection of the defendant's constitutional right to an opportunity to present a complete defense, and the obligation of the trial court preliminarily to determine the relevance of proffered

---

[15] The trial court never evaluated whether Moghalu's proffer, with the following elements, satisfied the prima facie requirements for a TPP defense: (a) the alleged TPP, Jay Rock, was present "on the scene" at the time of the shooting, along with his friend, cooperating witness Dwayne Williams, who was one of the two individuals who shot Harrison; (b) Jay Rock was motivated, like Williams, to protect David Warren from Harrison's likely testimony at Warren's murder prosecution; (c) Jay Rock's presence with Williams "on the scene" gave him the "practical opportunity" to shoot Harrison, *Winfield*, 676 A.2d at 5, and (d) Jay Rock had a closer resemblance to the shooter than Moghalu, according to the victim, Harrison. Taken together, if true, these proffered facts — to be elicited only through cross-examination of Dwayne Williams — appear consistent with at least a "reasonable possibility," *id.* at 4 (italics omitted), that Jay Rock, not Moghalu, committed the charged offense. The government never contended otherwise.

evidence and weigh its probative value against the potential it creates for undue prejudice."[16] Thus, to assure that the nexus between the proffered TPP and the crime is sufficiently clear to justify the defense, *Winfield* applied the same formulation for relevant evidence that the trial court "generally does in the criminal context": whether the TPP "evidence 'tend[s] to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense' . . . ."[17]

In announcing this test, *Winfield* also observed that a TPP defense, at least potentially, "risks misleading the jury by distracting it from the issue of whether *this* defendant is guilty or not."[18] Moreover, the "risk of [jury] confusion may be exacerbated if the government, in response to the defense proffer, asserts the need to present 'rehabilitative' evidence [at trial] disassociating the victim from other persons allegedly harboring a motive to harm her."[19] This can lead to a trial management problem. Unless admissibility of TPP evidence is addressed before

---

[16] *Id.* at 2 (internal citations omitted).

[17] *Id.* at 5 (quoting *(Woredell) Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1989) (emphasis added)).

[18] *Id.*

[19] *Id.*

trial, the clash between the defendant's right to present a complete defense and the government's prerogative to contest TPP evidence presumably could catch the trial judge "unaware," as we warned in *Jordan*.[20] It also might risk "distracting" the jury with a "trial-within-a-trial" of the TPP evidence, as we stressed in *Winfield*[21] — a foreseeable result that the trial judge must "retain full authority to prevent . . . ."[22] Accordingly, we concluded that, "[a]s with admissibility questions under *Drew v. United States*,[23] the issue of whether third-party perpetrator evidence will be

_____

[20] *Jordan*, 722 A.2d at 1262.

[21] *Winfield*, 676 A.2d at 5.

[22] *Id.*

[23] 331 F.2d 85, 89-90 (D.C. Cir. 1964) (explaining that while evidence of other crimes "is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged," such evidence is admissible for a "substantial, legitimate purpose" such as to show motive, intent, absence of mistake or accident, common scheme or plan, or identity); *see (William) Johnson v. United States*, 683 A.2d 1087, 1100 n.17 (D.C. 1996) (en banc) ("[T]he trial court has the discretion to require parties to disclose in advance their intention to use evidence of other crimes, and in any event a prosecutor may find it prudent to afford such notice. Such notice may obviate any possible claim of unfair surprise and may avoid a request for continuance.").

admitted should normally be resolved as a preliminary matter before trial,"[24] at least "provisionally,"[25] until final resolution at trial.

At the ex parte hearing before trial, Moghalu did not ask for pretrial resolution of his TPP defense, but counsel decided to "flag it" in advance "rather than delay the trial." The trial court then decided to make a pretrial ruling, presumably attentive to *Winfield's* reference to a TPP ruling as a "preliminary matter."[26] As explained above, the court concluded, after discussion with counsel, that "under Winfield, I believe you are required to disclose a third-party perpetrator" to the government at the pretrial hearing.

**2. Moghalu's Contention**

---

[24] *Winfield*, 676 A.2d at 6 n.6.

[25] *Jordan*, 722 A.2d at 1262. Realistically, in fact, every pretrial decision to allow a TPP defense based on an ex parte proffer by the defense is provisional, whether the court says so expressly or not. Whenever the trial court makes such a pretrial decision, it is inherently tentative until the government has an opportunity at trial to contest admissibility, as well as to challenge the evidence before the jury that supports an admitted TPP defense.

[26] *Winfield*, 676 A.2d at 6 n.6.

At the ex parte pretrial hearing, counsel for Moghalu asserted, without citing authority, that "clearly, the defense is not required to disclose its defense." However, instead of inviting argument on this contention, the court immediately advised counsel that *Winfield* required disclosure of Moghalu's proffered TPP defense to the government at a pretrial hearing. Although defense counsel, at that point, did not interject an explanation describing the reasons for his objection to pretrial disclosure — including whether he was relying, in part, on constitutional grounds — there is no question that Moghalu was objecting to the trial court's claimed authority to require the contested pretrial disclosure. Moreover, the government offers no challenge that would limit the range of Moghalu's arguments to this court.

On appeal, Moghalu relies primarily on our decision in *Bowman*,[27] an interlocutory appeal during a robbery prosecution. We barred the trial court from sua sponte requiring pretrial disclosure of "the general nature of the defense" — a bar (treated as mandamus) covering all "general issues," meaning we banned court-

_____

[27] *See supra* note 9.

ordered pretrial disclosure of any and every "affirmative defense."[28] In Moghalu's case, the trial court required pretrial disclosure of a specific — and inherently discretionary — TPP defense. As *Bowman* recognized, moreover, not every defense is shielded from pretrial disclosure and related government participation (specifying alibi and insanity).[29] We indicated, however, that the authority to justify government discovery of the defense in criminal cases is limited to "[s]tatutes, judicial decisions and the rules of the Superior Court"[30] — none of which, argues Moghalu, supports the court-ordered pretrial disclosure here.

We do not read *Bowman* as permitting the trial court to lawfully issue "a judicial decision" in a pending proceeding that authorizes pretrial disclosure of a TPP defense to the government. In our *C.A.P.* decision,[31] this court held that,

---

[28] *Bowman*, 412 A.2d at 11-12 & nn.1, 3 (The trial court, however, permitted the defense of "alibi or any affirmative defense . . . through the testimony of the appellant himself" in the event that appellant would not otherwise disclose his defenses, and it further "permitted defense counsel to give an *ex parte* proffer of the anticipated defense to preserve the record for appeal.").

[29] *See id.* at 12.

[30] *See supra* note 9.

[31] *In re C.A.P.*, 356 A.2d 335 (D.C. 1976).

although the Superior Court may adopt procedural rules, it "exceeded its statutory grant of power" by "adopt[ing] a rule which abridge[d] a substantive right."[32] Presumably a judicial decision abridging a substantive right would fare no better. Moreover, the authority for a "judicial decision" governing discovery of the defense referenced in *Bowman* was *Brady*,[33] a preexisting ruling, the only kind that, in context, makes sense. Finally, we emphasized in *Winfield* that, in considering a defendant's TPP proffer, "the trial court must resolve close questions of admissibility . . . in favor of inclusion, not exclusion," in part because "a substantial proffer that a third person committed the offense implicates the defendant's constitutional right to 'a meaningful opportunity to present a complete defense.'"[34]

_____

[32] *Id.* at 343, 344

[33] *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring the government to provide the defense with certain pretrial discovery). *See Bowman*, 412 A.2d at 12 & n.5.

[34] *Winfield*, 676 A.2d at 6-7 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).

*Bowman*, however, did not expressly say that its barrier to court-ordered pretrial disclosure of "the general nature of the defense"[35] was a constitutional ruling; rather, we concluded that "the trial court's action amounted to a[] usurpation of power";[36] "the trial judge's order was outside the scope of express authority"[37] — at law, commonly called *ultra vires* ("beyond power").[38] *Bowman* nonetheless was clear, providing Moghalu's fundamental argument: absent a statute, court rule, or preexisting constitutional decision authorizing court-ordered pretrial disclosure of an affirmative defense, such disclosure would fall outside the court's authority to require.[39]

––––––––––––––––

[35] *Bowman*, 412 A.2d at 12.

[36] *Id.*

[37] *Id.*

[38] *Merriam-Webster's Collegiate Dictionary*, 11th ed., 1357 (2003) ("beyond the scope or in excess of legal power or authority").

[39] Citing judicial decisions from this court and elsewhere, Moghalu also argues that the trial court's pretrial disclosure order was unconstitutional, an issue we need not reach. *See Middleton v. United States*, 401 A.2d 109, 115-16 (D.C. 1979) (absent relevant statute controlling criminal discovery, trial court lacked authority to order defense counsel to surrender evidence to government gathered by defense investigator, given "proper respect" required for "Fifth Amendment's guarantee against self-incrimination" and "Sixth Amendment's guarantee of effective assistance of counsel"); *United States v. Wright*, 489 F.2d 1181, 1184-85, 1195 (D.C. Cir. 1973) (reversing convictions where trial court ordered defense investigator to disclose to government a report he had prepared based on witness

### 3. The Government's Argument

Interestingly, on appeal, the government does not argue that the trial court correctly concluded that *Winfield* "required" its pretrial participation. Instead, the government contends that the trial court soundly exercised its discretion[40] to require pretrial disclosure of Moghalu's TPP defense. After re-characterizing the court's ruling as a discretionary decision, the government urges us to validate the court's perceived need to include the prosecutor at a pretrial TPP hearing, in order (says the government) "to make an informed decision on the admissibility of this [TPP] evidence."

_____

interviews because "[t]he defendant has a right under the Fifth Amendment to compel the state to investigate its own case, find its own evidence, and prove its own facts. The defense has no duty to help the prosecution convict the defendant."); *see also United States v. Hernandez-Meza*, 720 F.3d 760, 765 (9th Cir. 2013) (unless court rules and precedents require advance notice of a defense to the government, e.g., insanity and alibi, the defendant "is entitled to remain silent as to what defense he will present, and the government must anticipate any issues he might raise").

[40] *See generally (James) Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979) (explaining this court "must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries are answered in the affirmative that we hold that the trial court 'abused' its discretion" and that reversal is required).

The government's failure to dispute Moghalu's contention that the trial court erred in believing the pretrial TPP disclosure was "required" might lead one to argue that the government implicitly has conceded error, allowing us to move directly to harmless error analysis. On the other hand, because the government argues for legality of the pretrial disclosure on another ground — the sound exercise of trial court discretion — we should account for this alternative argument, rather than fold it immediately into a comprehensive treatment of harmless error, especially because the trial court offered a reasoned, not merely automatic, basis for its decision. [41]

As the first step in its analysis, as we have noted, the government declines to contest Moghalu's assertion that *Winfield* does not "require" pretrial disclosure of a TPP proffer. Next, the government says — and we agree — that admissibility of

_____

[41] As noted earlier, during the pretrial ex parte conference with defense counsel — before the trial court announced its belief that *Winfield* "required" pretrial disclosure of an alleged third-party perpetrator — the court offered its initial view of the situation in discretionary language: "I think it would be appropriate and fair to give the Government an opportunity to have a say" before trial on whether the TPP defense "should be permitted or not; in other words, it needs to be fleshed out." In particular, "as Winfield has said," the government should have "the opportunity . . . to rehabilitate its victim." *See supra* note 13 and accompanying text. Based on these statements, it seems likely that, absent the trial court's understanding that *Winfield* "required" pretrial disclosure, the court — exercising its discretion — would have invited the government's participation.

TPP evidence at trial, under *Winfield*, is "committed to the trial court's discretion."[42] The government then argues that the trial court's pretrial disclosure order also should be evaluated as an exercise of discretion (implicitly a subset of the overall admissibility determination), and that, supported by *Winfield's Drew* analogy, the court did not abuse its discretion because (in the government's words) the court "needed" the government's pretrial participation "to make an informed decision on the admissibility of this [TPP] evidence."

Finally, the government maintains that, even if the court did abuse its discretion, the government has carried its burden of proving that the abuse was "harmless" under the non-constitutional standard elaborated in *Kotteakos* ("judgment was not substantially swayed by the error").[43]

## 4. Analysis

---

[42] *(James) Johnson*, 398 A.2d at 363; *see supra* note 40 and accompanying text.

[43] *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

We are confronted, therefore, by two quite different contentions. Moghalu leads with an argument, based primarily on *Bowman*,[44] that the trial court erred when issuing the pretrial disclosure order. He then cites *Kotteakos*[45] to support his contention that the error was not harmless.[46] The government, to the contrary, sidesteps *Bowman* by relying on *Winfield's* analogy that likens a pretrial TPP ruling to a pretrial resolution of *Drew* (other crimes) issues,[47] allegedly allowing the trial court — unconstrained — to issue the pretrial disclosure order as a sound exercise of discretion.[48] The government's analogy to *Drew*, however, coupled with references to our case law urging resolution of TPP issues before trial,[49] does not

_____

[44] *See supra* note 9.

[45] *See supra* note 43 and accompanying text.

[46] In arguing for reversal based on constitutional, as well as non-constitutional grounds, Moghalu maintains that the trial court's error would not be harmless under either *Chapman v. California*, 386 U.S. 18, 24 (1967) ("harmless beyond a reasonable doubt") or *Kotteakos* (*see supra* note 43 and accompanying text). Nevertheless, he acknowledges that we need not reach the constitutional issue: "This court need[] not decide which standard [for determining harmless error] applies, . . . because even under *Kotteakos* the government has failed to meet its burden."

[47] *See supra* note 23.

[48] *See supra* note 41.

[49] *See Jordan*, 722 A.2d at 1262; *Winfield*, 676 A.2d at 6 n.6.

resolve the pretrial issue before us. These authorities neither mandate pretrial resolution nor add any impetus toward involvement of the government at a pretrial TPP hearing. Therefore, although we agree with the government that admissibility of TPP evidence *at trial* is committed to trial court discretion, we cannot agree that this necessarily means the trial court has discretion to order the government's participation at a *pretrial* assessment of a TPP proffer's sufficiency.[50] It is therefore important to focus more specifically on the scope of a pretrial *Winfield* hearing and the trial court's options for conducting it.

By stating that admissibility of TPP evidence "should *normally* be resolved as a preliminary matter before trial,"[51] *Winfield* does not necessarily *require* pretrial resolution, let alone require pretrial resolution with government participation at a hearing. And in any event, as noted earlier, absent government participation, a pretrial resolution can only be provisional (whether expressly stated as such or not);

---

[50] We have stressed that a TPP defense can be characterized as "'defensive' or 'reverse' *Drew* evidence." *Newman v. United States*, 705 A.2d 246, 253, 255 (D.C. 1997). But this analogy includes no suggestion that the court's pretrial assessment of TPP relevance permits or requires the prosecutor to participate.

[51] *Winfield*, 676 A.2d at 6 n.6 (emphasis added).

admissibility cannot be final until the government has an opportunity to contest it at trial[52] (or perhaps via pretrial motion *in limine* to exclude an anticipated TPP defense).[53]

Accordingly, pretrial colloquies between defense counsel and the court are presumptively ex parte, leaving the trial court with but three options upon receiving Moghalu's pretrial TPP proffer: (1) if the proffer was inadequate, the court could have ruled the TPP defense inadmissible (subject to enhancement for reconsideration at trial); (2) if the proffer appeared to be adequate, the court could have ruled it provisionally admissible, subject to the government's response at trial before a final ruling; and (3) if the proffer was inconclusive, the court could have deferred the ruling until trial, or resolved the matter definitively, before trial, if the defense had agreed to the government's appearance at a pretrial hearing.

The trial court chose none of these options, instead requiring Moghalu's pretrial disclosure of his TPP defense without Moghalu's agreement — an error

---

[52] *See supra* note 25.

[53] *See supra* note 11 and accompanying text.

derived from *Bowman* (as no statute, court rule, or preexisting judicial decision supported such pretrial disclosure).[54] Moreover, the government's apparent argument that *Bowman* is irrelevant, in light of *Winfield's* reliance (by analogy) on *Drew* to justify pretrial disclosure of a TPP defense, would permit that analogy to displace *Bowman's* unchallenged authority. Finally, the disclosure error prejudiced the defense, requiring reversal; the error was not harmless.

### D. Harmless Error?

### 1. Standard of Review

To hold an error harmless under *Kotteakos*,[55] a court must be able to say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error. . . ."[56] Thus, our inquiry cannot merely be "whether there was enough to

---

[54] See *supra* note 9.

[55] See *supra* note 43 and accompanying text.

[56] *Kotteakos*, 328 U.S. at 765.

support the result, apart from the phase affected by the error."[57] The dispositive inquiry, rather, is "whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[58]

In applying *Kotteakos*, this court has observed that "the 'burden' is not on the appellant to show that he has suffered prejudice; rather, the issue is whether the record eliminates the appellate court's doubt about whether the error influenced the jury's decision."[59] Indeed, "we must find it *highly probable* that [the] error did not contribute to the verdict."[60] Finally, we have said, to "assess[] an error's impact, we typically take three factors into consideration: (1) the centrality of the issue affected by the error; (2) the closeness of the case; and (3) the steps taken to mitigate the effects of the error."[61] As elaborated below, after applying these factors to the record

---

[57] *Id.*

[58] *Id.*

[59] *Washington v. United States*, 965 A.2d 35, 41 (D.C. 2009) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436-40 (1995)); *see Pérez v. United States*, 968 A.2d 39, 93 (D.C. 2009) ("in cases of preserved error . . . the government bears the burden of showing that trial error was harmless").

[60] *Washington*, 965 A.2d at 41 (quoting *Wilson-Bey v. United States*, 903 A.2d 818, 844 (D.C. 2006) (en banc) (alteration in original)).

[61] *Id.* at 41-42 (internal quotation marks omitted).

as a whole, we cannot conclude that the trial court's error — requiring pretrial disclosure of Moghalu's TPP defense to the government — was harmless under *Kotteakos*.

## 2. Moghalu's Argument

As Moghalu correctly points out in his brief, "much of the government's evidence was uncontested; the only significant issue at trial was the identity of the second shooter" (allegedly Moghalu). The government did not have forensic evidence assuredly tying Moghalu to the shooting or placing him at the scene of the crime. Instead, Moghalu's identity as the second shooter depended on the testimonies of Williams and Hockaday, to some extent corroborated — and also offset — by the testimonies of Charles Harrison (a victim) and Loretta Young (a neighbor), and buttressed inconclusively by expert testimony derived from Moghalu's phone records.

As noted earlier, the TPP issue began with pretrial bench conferences. Defense counsel repeatedly asserted that Moghalu did not have an obligation to disclose his TPP defense to the government. He explained that the desire not to do so was largely motivated by Moghalu's concern that disclosure would give the

government a "strategic advantage" in "preparing Williams for . . . cross-examination," and that Williams, therefore, might "come up with a fabricated explanation of why [the second shooter] wasn't Jay Rock." Counsel accordingly was concerned, as stated in his brief, that the trial court's "compelled disclosure eliminated the element of surprise that is essential to effective cross-examination," and, further, that disclosure "gave the government the opportunity to prepare the witness for the anticipated cross-examination," and thus to minimize "his and Warren's relationship with J-Rock."

### 3. The Government's Response

The government responds that, even if the trial court erred in requiring pretrial disclosure of Moghalu's TPP defense to the government, the error was harmless for three reasons. *First*, during "cross-examination, defense counsel asked Williams whether prosecutors had informed him that [he would be questioned] about J-Rock," and Williams had answered "[n]o," adding that he had "assume[d]" the prosecutors had asked him about Jay Rock "because [he had] said that [he] talked to [J-Rock]."

*Second*, replies the government, "it is wholly speculative for appellant to claim that Williams would have answered appellant's questions differently had he

been more 'surprised'"; thus, the "record does not support appellant's assertion that the government specifically prepared Williams for his cross-examination regarding J-Rock."

*Third*, Moghalu "was not restricted in any way from eliciting evidence to support his third-party perpetrator defense from government witnesses on cross-examination; nor was [he] restricted from presenting third-party perpetrator evidence in the defense case."

Each of the government's arguments is unpersuasive. None satisfies the government's burden to establish, from the record, that the "judgment was not substantially swayed"[62] by the compelled disclosure — that the error did not have a "substantial influence" on the outcome.[63] The first and third arguments can be quickly disposed of; the second is the government's central concern.

**a. First and Third Arguments**

---

[62] *Kotteakos*, 328 U.S. at 765.

[63] *Id.*

For the government's *first argument*, we shall assume a truthful answer when Williams replied "[n]o" to defense counsel's question whether prosecutors had informed him that he would be cross-examined about Jay Rock (which Williams added he "assumed" would happen). Even so, we perceive no basis for saying that Williams's unelaborated answer helped sustain in a meaningful way the government's burden to negate any "substantial influence"[64] on his testimony attributable to the government's pretrial knowledge of Moghalu's TPP defense. Nor did Williams's answer tend to make it "*highly probable*" that the disclosure error "did not contribute to the verdict."[65]

The government's *third argument* — that Moghalu's presentation of his TPP defense was unrestricted — is also easily dismissed. His freedom to pursue the defense at trial, erroneously disclosed by judicial order before trial, is an insufficient answer. The issue is not whether Moghalu had an unfettered right to present the defense; rather, it is whether the government can prove that it did not gain an unfair

---

[64] *Id.*

[65] *Washington*, 965 A.2d at 41.

advantage from that error or, in the words of *Kotteakos*, that the error had no "substantial influence" — that "the judgment was not substantially swayed" by it.[66]

## b. Second Argument

In its *second (and central) argument*, the government contends that it is "wholly speculative" for Moghalu to maintain that the government's opportunity to prepare Williams for cross-examination — once he was aware of the focus on Jay Rock — generated a reasonable defense fear: that Williams would minimize his and Warren's relationship with Jay Rock, thereby diluting Jay Rock's motive to shoot Smith and Harrison and thus undermining Moghalu's TPP defense. The government therefore ignores the fundamental question: whether the trial might have played out differently had the government not erroneously received advance notice of Moghalu's TPP defense.

Counsel for Moghalu made clear to the court before trial, in arguing against pretrial disclosure of the proffered TPP defense, that he did not want to give the prosecution a reason to conduct additional investigation, further prepare its

---

[66] *Kotteakos*, 328 U.S. at 765.

witnesses, and, as a result, adjust its strategy. More specifically, Moghalu sought to prevent this disclosure because he wanted to deprive the government of an opportunity to help Williams, its key witness, get his story straight about his knowledge of the shooting, his relationship with Jay Rock, and Jay Rock's appearance "on the scene" of the crime.

In response, arguing that the record "does not support appellant's assertion that the government specifically prepared Williams for his cross-examination regarding J-Rock," the government again overlooks that, "in cases of preserved error . . . the government bears the burden of showing that trial error was harmless . . . ."[67] Thus, Moghalu need not demonstrate how the compelled disclosure of his TPP defense was harmful; rather the government must demonstrate how the compelled disclosure of Moghalu's TPP defense was harmless. Not only does the government fail to acknowledge and carry its burden, but also the record permits a strong inference that the compelled disclosure of Moghalu's TPP defense was affirmatively harmful.

_____

[67] *Pérez*, 968 A.2d at 93; *see Washington*, 965 A.2d at 41; *see also Kotteakos*, 328 U.S. at 760.

Defense counsel was required to disclose Moghalu's TPP defense to the government four days before his jury trial began. During trial, defense counsel questioned Detective Alfred T. Austin-Braxton of the Metropolitan Police Department about his investigation. Counsel asked: "[Y]ou said that the investigation into who J-Rock was and the conversations with Dwayne Williams about J-Rock was relatively recent, on the eve of trial?" Detective Braxton replied, "That is correct." During further questioning, the detective confirmed that he had been investigating Jay Rock just before trial as a result of his conversations with the prosecutors; for purposes of Moghalu's trial, he had not been satisfied with his interviews of Williams three years earlier when he had heard Jay Rock mentioned several times.

Significantly — perhaps most detrimental to the government's argument that the pretrial disclosure did not result in prejudice to Moghalu — is the following statement made at trial by the prosecutor:

> I'm going to object to the question [to Williams by defense counsel]. ["]Did you prior to your testimony today did you talk with the prosecutor about J-Rock [?"] and here's why: As your Honor well knows you shared with the government the third[-]party perpetrator defense that Mr. Zucker shared with the Court and *we were permitted to*

> *talk with our witnesses, our detectives and what have you about who this third party perpetrator might be.*[68]

Despite this acknowledgment, the government argues that there is no hard evidence that its investigation of Jay Rock was prompted by the disclosure of Moghalu's TPP defense. The government, however, does not address Detective Braxton's or the prosecutors' discussions with Williams just before trial, explaining why they could not be understood as efforts to shape Williams's testimony or otherwise prepare him in a way that would help the prosecution resist Moghalu's TPP defense. To repeat: the burden of proving harmlessness is on the government, which offers no record evidence to refute the defense-proffered, prima facie reasonable explanation for the investigation regarding Jay Rock on the eve of trial: to rehearse and improve Williams's testimony, as all but admitted by the trial prosecutor ("we were permitted to talk with our witnesses, our detectives . . . .").

---

[68] This statement, implying that the government had spoken with its witnesses (among them Williams and Hockaday) about who the third-party perpetrator might be, was consistent with Williams's testimony that prosecutors had asked him about Jay Rock in meetings "the last few days" before he took the stand, as well as with his testimony that prosecutors did not tell him that defense counsel was going to cross-examine him about Jay Rock during the trial.

The government knew about Jay Rock three years before Moghalu's trial by interviewing Williams, but it never investigated Jay Rock, in part, according to Detective Braxton, because "[h]e didn't match the description . . . that was provided by the other witness that saw the three individuals running from the scene." On the eve of trial, however, at around the same time that Moghalu was compelled to disclose his TPP defense, the government investigated Jay Rock and met with Williams to discuss Jay Rock. While it is possible that this last minute flurry of activity had nothing to do with defense counsel's compelled disclosure of its TPP defense, the government has the burden of demonstrating at least some plausible reason other than the most obvious: that it investigated Jay Rock for the first time, and spoke to Williams about him, to combat as forcefully (and fairly) as possible the TPP defense it had just learned about. No other reason was — or is — forthcoming.

### 4. Conclusion

Considering the three factors we typically apply when assessing the impact of trial court error, we conclude that it is not "*highly probable* that [the] error did not contribute to the verdict."[69]

_____

[69] *Washington*, 965 A.2d at 41-42.

*First Factor* ("centrality of the issue").[70] The identity of the second shooter, allegedly Moghalu, was the primary issue in this case. As one of two witnesses who identified Moghalu as the second shooter, Dwayne Williams (the government's key witness) offered testimony regarding Jay Rock as a potential third-party perpetrator — testimony obviously relevant to a "central issue" in Moghalu's prosecution. Williams's testimony directly tied Moghalu to the crimes for which he was convicted, using Moghalu's acquaintance with David Warren to paint a picture of someone who was willing to kill, and indeed did so, in retaliation for the victims' decision to "snitch" on Warren.

*Second Factor* ("closeness of the case").[71] The strength of the government's case against Moghalu, while substantial, cannot be called robust. The only direct evidence connecting Moghalu to the shooting were the testimonies of two individuals engaged in criminal activity, Hockaday and Williams, who were impeached with numerous prior inconsistent statements and had a motive to curry favor with the government in their own criminal proceedings, as well as to protect

_____

[70] *Id.* at 41

[71] *Id.*

each other. Further, neither knew Moghalu particularly well, or at least for very long, and therefore the strength of their testimonies as to his relationship with Warren and what he would be willing to do for Warren is somewhat diminished.

Loretta Young, a retired teacher living at an apartment near the scene of the shooting, corroborated certain aspects of Williams's and Hockaday's testimonies: that she heard gunshots, saw three men on M Street walking at a fast pace from 21st Street, and saw one of the men toss a gun onto the roof of a building adjacent to her own. However, her most relevant testimony — about the descriptions of the men she had seen — conflicted with the description of the second shooter given by the surviving victim, Charles Harrison.  Specifically, Young testified that none of the men she observed had dreadlocks, whereas Harrison testified that the shooter had "dreads to [his] collar."  Moghalu did not have dreadlocks. While it is possible that the trauma of being shot interfered with the sharpness of Harrison's memory, he was at least arguably, perhaps indisputably, in a better position to describe his assailants than Loretta Young from her second-story window.

As circumstantial evidence, the government points to the fact that Moghalu's phone records indicate he was in the area of the shooting around the time it occurred. This evidence is of limited strength, however, as Moghalu lived in that area. Of

particular significance, the government's expert confirmed it is impossible to tell from these records whether Moghalu's phone was at the scene of the murder, in his home, or somewhere else nearby. While evidence of one's presence near the scene of a crime might, at least initially, raise eyebrows, it is not particularly unusual to be found in or near one's own home.

*Third Factor* ("steps taken to mitigate").[72] Finally, there were no steps taken by the government to mitigate the effects of the error. This is understandable, as the government did not create the error; rather, the trial court erred by requiring defense counsel to disclose Moghalu's TPP defense to the government before trial as a condition for presenting the defense. Because the government was not responsible for the trial court's error, the prosecution likely determined that it had no reason to take steps to demonstrate that pretrial disclosure would be harmless — assuming the government even perceived that disclosure might be error in the first place. Therefore, rather than anticipatory mitigation of the error by declining to share the TPP proffer with its investigators and witnesses, the government — as the trial prosecutor implied — likely did what one would expect: it used the information about Moghalu's TPP defense to strengthen its case against him. In other words, the

_____

[72] *Id.* at 41-42.

trial court caused the error and the government likely took advantage of the knowledge it gained, in order to put on the best case it could.

With Williams's testimony about Jay Rock leaving Williams's credibility somewhat in doubt, all the jury had left was the testimony of Hockaday that Moghalu was the shooter, the testimony of Young that conflicted with Harrison's descriptions of the likely shooters, and Moghalu's phone records, which indicated that his cellphone could have been at the crime scene, at his home, or at another nearby location. Similar to the situation we addressed in *Flores*,[73] it is largely the "lack of a record" in this case that "not only makes it impossible for [the court] to evaluate whether a significant" change in testimony occurred, but "it also precludes the government from meeting its burden to show harmlessness . . . ."[74] As we are "left in grave doubt, the conviction[s] cannot stand."[75]

---

[73] *Flores v. United States*, 698 A.2d 474 (D.C. 1997).

[74] *Id.* at 481.

[75] *Kotteakos*, 328 U.S. at 765.

It is therefore unnecessary to reach appellant Moghalu's other two claims of error, contesting admission of lay opinion testimony from a government witness and barring recross-examination of another government witness.

*****

For the reasons elaborated above, the judgments of conviction are reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered*.

EASTERLY, *Associate Judge*, concurring: We hold in this opinion that a trial court may not—indeed has no authority to—order disclosure of a third party perpetrator defense to the government pretrial and that the trial court in this case was mistaken to think this court's opinion in *Winfield v. United States*, 676 A.2d 1(D.C. 1996) (en banc) required such disclosure. Our holding is compelled by our decision in *Bowman v. United States*, 412 A.2d 10 (D.C. 1980) and by *Winfield* itself.

In *Bowman*, this court reviewed a petition for a writ of mandamus challenging the trial court's order to defense counsel to disclose pretrial to the government "the general nature of the defense." 412 A.2d at 11-12. We explained that discovery in criminal cases was wholly regulated by "statutes, judicial decisions [*e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963), regarding constitutionally mandated discovery[1]] and the rules of the Superior Court." *Bowman*, 412 A.2d at 12 (internal quotation marks and citations omitted). "As to statutes or judicial opinions we . . . found none . . . which hold that a trial court has the power to compel the defendant to divulge his defense before trial." *Id.* "Looking to the Superior Court rules," we noted "they expressly authorize pretrial disclosure of defense matters in only two instances," referring to alibi and insanity defenses (the obligation to disclose a public authority defense had not yet been added to the rules).[2] *Id.* We not only concluded the trial

_____

[1] *See* 2 WRIGHT & MILLER, FED. PRAC. & PROC. CRIM. § 251 (4th ed. 2020) (explaining that, although creation of discovery rules is generally the province of "rulemakers and legislators," there are also "constitutional considerations that cannot be ignored" by the courts, citing *Brady* as an example).

[2] *See* Super. Ct. Crim. R. 12.3 (effective as of 2016); *see also* Fed. R. Crim. P. 12.3 (effective as of 1988). Before making changes to the Rules of Criminal Procedure, the Superior Court follows an established internal process for reviewing proposals, which involves review by the relevant advisory committee, review by the Superior Court Rules Committee, publication of notice and request for comment, review of public comments, consideration by the Superior Court Board of Judges, and as needed, review and approval by this Court. *The Rulemaking Process*,

court's disclosure order was outside the scope of its express authority, we rejected the government's argument that "the trial court's action . . . was proper pursuant to its 'inherent powers' to regulate pretrial disclosures," *id.*, under Superior Court Criminal Rules 17.1 ("Pretrial Conference") and 57(b) ("Procedure When There Is No Controlling Law"). We definitively stated that "[t]hese rules . . . give absolutely no support to the government's position"; that they "are designed to provide procedural forums or leeway to lighten ministerial burdens and expedite trial"; and "[i]n no way are they intended to 'authorize' unauthorized discovery." *Bowman*, 412 A.2d at 12 (internal quotation marks and citation omitted). Accordingly, we concluded that the trial court's ruling directing pretrial disclosure of the defense theory to the government "amounted to a[] usurpation of power . . . ." *Id.*

To think that *Winfield* changed this legal landscape in a one-sentence footnote making a passing observation that preliminary assessments of third party perpetrator

_____

DISTRICT OF COLUMBIA CTS., https://www.dccourts.gov/superior-court/rules-committee/rule-making-process; https://perma.cc/S5GQ-W8UY (last visited October 27, 2021); *see also* Super. Ct. Bd. of Judges Res., Prepublication of Rule Amendments (Jan. 18, 1979) (requiring notice and comment "with respect to proposed changes in [the] Rules unless the [Superior] Court determines that to do so in a particular case would be impractical or would serve no purpose").

evidence should "normally" be made pretrial, 676 A.2d at 6 n.6, makes little sense. After all, *Winfield* did not say that third party perpetrator evidence is the subject of exceptional concern and requires special vetting. It said the exact opposite. *Winfield* held that third party perpetrator evidence is *not* inherently concerning and should not be subject to heightened scrutiny.

As we explained in *Winfield*, the trial court ruling in that case "reflect[ed] the lingering notion in our decisions that relevance means something different as regards evidence that a third party committed a crime than it does in other contexts." *Id.* at 4. *Winfield* held that this "notion" was incorrect, explaining "the 'reasonable possibility' formulation of *Johnson* and its conclusion that relevance here means what it generally does in the criminal context[: it] requir[es] a 'link, connection or nexus between the proffered evidence and the crime at issue.'" *Id.*; *id.* at 5 (disavowing the imposition of a "more exacting standard" of admissibility). *Winfield* observed there was no need to take any special effort to restrict admission of third party perpetrator evidence because "sifting the relevance of that evidence is largely about drawing commonsense inferences from uncomplicated facts, something we regularly entrust to juries." *Id.* at 7. And *Winfield* underscored the point that third party perpetrator evidence did not need to be handled with special

care and subjected to special vetting by directing trial courts to "resolve close questions of admissibility . . . in favor of inclusion, not exclusion," in part because "a substantial proffer that a third person committed the offense implicates the defendant's constitutional right to 'a meaningful opportunity to present a complete defense.'" *Id.* at 6-7.

How incongruous would it have been for the en banc court in *Winfield* to have held that third party perpetrator evidence need not be subjected to special scrutiny, but then to hold (in disregard of *Bowman* and the constitutional concerns *Winfield* itself acknowledged) that the defense must take the highly unusual and intrusive step of disclosing a third party perpetrator defense to the government pretrial? *Winfield* did not do this.[3] Instead, by rejecting a heightened relevance standard for evidence

_____

[3] It is immaterial that *Winfield* prefaced its observation about "preliminary" pretrial admissibility assessments in footnote 6 with a reference to assessments of "other crimes" evidence under *Drew v. United States*, 331 F.2d 85 (D.C. Cir. 1964). 676 A.2d at 6 n.6. This court has only endorsed a trial court's authority to require *the government* to provide the defense with advance notice of use of *Drew* evidence. *See, e.g.*, *Jones v. United States*, 127 A.3d 1173, 1185 (D.C. 2015); *Wilson v. United States*, 690 A.2d 468, 472 & n.4 (D.C. 1997) (Ruiz, J., concurring). Although we have never explicitly identified a source of authority for such trial court discovery orders, *see Ford v. United States*, 647 A.2d 1181, 1184 (D.C. 1994) (acknowledging the absence of a specific rule mandating disclosure, quoting *Lewis v. United States*, 567 A.2d 1326, 1329 (D.C. 1989)), a review of our cases indicates that whether such

in support of a third party perpetrator defense, the en banc court made it clear that

normal procedures for assessing its admissibility apply[4]—a rationale that precludes

_____

orders are justified and warranted turns on whether the proffered evidence amounts to propensity evidence, the admission of which implicates a defendant's constitutionally protected presumption of innocence and right to a fair trial. *See Wilson*, 690 A.2d at 474 (Ruiz, J. concurring) (explaining that "advance notice would be appropriate where the misconduct would have a strong tendency to show propensity on the part of the defendant to commit the crime charged"); *see also Thompson v. United States*, 546 A.2d 414, 419 (D.C. 1988) (recognizing the indispensability of the rule barring use of propensity evidence "to the presumption of innocence" and the "potential for evidence of other crimes to deny the defendant a fair trial"). We have never upheld the legitimacy of a trial court's order compelling disclosure by the defense of similar evidence to the government.

[4] Of course, normally, any pretrial discussion of the defense theory or strategy is conducted ex parte. *See, e.g.*, *Henry v. United States*, 94 A.3d 752, 755 (D.C. 2014) (self-defense theory proffered in ex parte bench conference before defendant took the stand); *Legette v. United States*, 69 A.3d 373, 380 (D.C. 2013) (trial judge confirmed defense theory ex parte before making admissibility ruling regarding prior bad acts); *Ventura v. United States*, 927 A.2d 1090, 1098 (D.C. 2007) (trial judge invited counsel to share defense theory in ex parte bench conference prior to ruling on request for DNA testing); *Boykin v. United States*, 738 A.2d 768, 772 (D.C. 1999) (defense counsel revealed in ex parte bench conference, mid-cross examination, that it was seeking to elicit information about a third-party perpetrator from government witness, and court rejected proffer as insufficient without involving government); *Williams v. United States*, 310 A.2d 244, 246 (D.C. 1973) (explaining that ex parte proceedings, where indigent defendants can request expert services such as psychiatric evaluations, are necessary to avoid "premature disclosure of [the defense's] case").

This is because the Fifth Amendment's Due Process and Self-Incrimination Clauses, along with the Sixth Amendment's Assistance of Counsel Clause, together strongly protect against requiring the defense to disclose its evidence, strategies, or theories to the prosecution. *See United States v. Wright*, 489 F.2d 1181, 1195 (D.C. Cir. 1973); *Middleton v. United States*, 401 A.2d 109, 115–16 (D.C. 1979). In short,

the imposition of other special constraints like a disclosure obligation to the government pretrial.

Perhaps the government's practice of filing motions in limine to preclude a third party perpetrator defense (presumably with the hope of forcing disclosure of the existence vel non of such a defense) has led to the misimpression in Superior Court both that the government is entitled to know of a third party perpetrator defense pretrial and that trial courts have an obligation to direct pretrial disclosure of such a defense to the government if disclosure is not voluntarily made.  We now clarify that the government is not entitled to know of a third party perpetrator defense pretrial, that (per *Winfield*) the government has no need to know of a third party perpetrator defense pretrial, and that it is error for a trial court to direct pretrial disclosure of a third party perpetrator defense to the government.

_____

whereas the government has a constitutional obligation to disclose certain information "to assist the defense in making its case[,]" *Vaughn v. United States*, 93 A.3d 1237, 1253 (D.C. 2014) (quoting *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985)), "[t]he defense has no duty to help the prosecution convict the defendant," *Wright*, 489 F.2d at 1195, and is ordinarily constitutionally protected from being compelled to make pretrial disclosures to the government that might assist in bringing about the defendant's conviction.